CHARLES KELLY, plaintiff in error, *vs.* THE STATE OF GEOR-
GIA, defendant in error.

1. There was no error in admitting the record of the indictment and con-
viction for the opprobrious words. It went to show a motive and to
explain the threats and words of the prisoner. (R.)
2. The evidence in this case is of such a character that this Court can-
not say that the presiding Judge committed an error in refusing a new
trial. (R.)

Criminal law.    Evidence.    New trial.    Before Judge
GREENE.    Newton Superior Court.    September Adjourned
Term, 1872.

Charles Kelly was tried for the murder of William H.
Hardeman, and found guilty.    A motion was made for a new
trial on two grounds:

1st. That the Court had erred in admitting as evidence
against the defendant the record of an indictment and judg-
ment thereon, against the prisoner for using opprobrious words,
etc., against the deceased, on which, some months before the
killing, he had been tried, found guilty and punished.

2d. That the verdict of guilty by the jury was strongly and
decidedly against the evidence.

The evidence made the following case:

The killing was done on the 19th of August, 1872, in the
evening, shortly after dark; the deceased was shot by an as-
sassin as he stood in or near his own door, from a clump of
plum trees on the opposite side of the road from the house.

The prisoner had for some time before entertained feelings
of strong enmity to deceased; in fact, before the killing, he
had gone to the deceased's house, which was a mile and a
half from prisoner's, and stealthily shot deceased's dog in his
own yard.

Not long after this he had confessed to one Knight that he
shot the dog, and went out of the yard to kill the two-legged
dog if he should come out.

At another time he told Knight he did not want to do
it, but if Hardeman bothered him he would kill him; again

he had said to him, next time he would kill the two-legged dog.

In the winter or spring before the killing, one Harvey had heard prisoner say he intended to put Hardeman out of the way with "these or something longer," putting his hand where he usually wore his pistols.

At the May term of Newton Superior Court he had been tried and found guilty and punished for having, in May, 1871, used to, and in the presence of Hardeman, opprobrious words, to-wit: "You are a damned liar and a damned coward;" and as he was returning home from the trial, he had said to one Crawford that he had been advised to kill Hardeman, but there was a better way; and, again, that he never would be satisfied until he tried him with these—putting his hand on his pistol.

In June, before the killing, he had threatened to kill deceased in presence of Mr. Calhoun, and to the same man he had, at another time, said—speaking of deceased—"I will shoot his damned heart out," shaking his pistol in his hand, "I told Tom Osborn so this morning."

About a month before the killing, on hearing Mr. Bobo declare that if Hardeman said to his face what he had heard, *he* would kill Hardeman or Hardeman should kill him, he offered to aid Mr. Bobo in killing deceased.

About three weeks before the killing, he had said to Mr. Gregory that he would take a stick and beat deceased till the life was only just in him, and that he would keep his pistol at his head whilst he was doing it.

On the very day of the killing, having shot a dove, as he was reloading his gun, he had said to Mr. Calhoun (to whom he twice at other times, on previous occasions, said he intended to kill Hardeman,) that he was loading his gun this time for higher game than he usually shot at.

In tracing the track of the assassin, it was found that he wore a number seven or eight shoe, and one of the shoes, probably the right, though this was uncertain, had a hole in it so that the big toe and the one next it made an impression

on the soft earth. From the evidence in the record, it is fair to infer that this mark of the toes was made when the assassin was crawling, dragging his feet behind him, and when he was running, though from the record this is not clear. Mr. Boyd testified that on the fourth day after the killing, the prisoner came to his house, wearing shoes of that number, the left of which had a hole exposing the big toe and the next. A Mr. Brown, who lived at the prisoner's father's, testified that prisoner had a pair of shoes which he often wore, having such holes, though from Mr. Boyd's statement the holes were only in the upper leather and not in the sole.

There was a coroner's inquest on the night of the killing, and the next morning one of the jury went to prisoner's on business; prisoner got into the juryman's buggy and rode with him about a mile; asked him what was the evidence— whether any warrant had been issued, and told the juryman he had heard they were going to arrest *him*, prisoner, and hoped if he heard of any such warrant he would let him know.

A note had been written to the grand jury, trying to cast suspicion on Mr. Bobo, and on a man by the name of Davis, from certain threats it was supposed they had made. Bobo admitted saying to the prisoner that if Hardeman said to his face what he heard, either he or Hardeman should die. Davis denied any threats, or any ill-will to Hardeman, and Bobo said he had seen Hardeman and found he had not so said, and all was well with them. There was evidence that this note was in Kelly's handwriting, but there was also evidence of the prisoner's brother contradicting this There were also papers in evidence to enable the jury to make a comparison of hands.

On the other hand it was in proof by prisoner's brother, his male and female cousins, and by his sister, that he was at home, a mile and a half or two miles from the scene of the tragedy at the very time it was proved to have occurred. This was also proved by a man named Jeffries, and his, Jeffries', mother, who lived only two hundred and fifty yards from the house of prisoner's parents, and with whom he was

Kelly *vs.* The State of Georgia.

at that time boarding. His brother, sister and female cousin testifying they heard him and young Jeffries talking and laughing, and the male cousin saying he saw him through the door of Mrs. Jeffries' house standing by the table; the time was marked by the rising moon, the killing also taking place just as it was rising. Jeffries and his mother both declared that prisoner was at their house from before sundown till bed-time, and had gone to bed on the floor, and the old lady said that the one and one-half hours she staid up, she had prisoner in sight all the time. Jeffries and his mother were proven by several witnesses to be of bad reputation and not worthy of belief in a Court of justice. The sister was attacked for the same reason; the evidence of the nephew was open to some strictures as to the probability, under the circumstances, of seeing a man after dark, at the distance of one hundred and fifty yards, inside of a small house with but one room, and no windows, through the open door, there being no proof of any light, while the brother had shown himself to have made threats to deceased and to have refused to go to his funeral as that of a damned dog.

The motion was overruled, and the defendant excepted upon each of the aforesaid grounds.

A. M. SPEER; J. J. FLOYD, for plaintiff in error.

T. B. CABINESS, Solicitor General, by PEEPLES & HOW-ELL; CLARK & PACE; L. B. ANDERSON, for the State.

McCAY, Judge.

1. We hardly think counsel for the plaintiff in error serious in the objection they made to the admission of the indictment, judgment, etc., for the misdemeanor. If the fact that the defendant had been indicted and punished at the deceased's instance was material, and this would seem to be a legitimate fact going to show a motive for anger expressed by prisoner against deceased—if such a fact was material, that is, competent—surely the record was the best evidence of it. That

Kelly *vs.* The State of Georgia.

he was angry then does not prove he retained that anger, but it is a fact which, with other facts, may fairly be used to get at the feelings of the prisoner on the day of the killing.

2. The real question in this case is, whether this tribunal—a Court of law, composed of three men, not of the vicinage—shall declare the verdict of the jury, chosen by law, and required and authorized by law to pass upon the facts, not supported by the evidence. We have again and again declared our opinion that this Court has no power to act as a Court of appeal from the verdict of the jury. Indeed, it is only by a sort of fiction that we have jurisdiction at all over a verdict of the jury upon the facts. The Constitution expressly declares that this Court shall have no original jurisdiction, but shall be a Court *alone* for the trial of errors *in law or equity* from the Superior Courts, etc. The Constitution gives to the Superior Court the right to grant new trials in the Superior Court, on proper and legal grounds, and it is only when the Judge of the Superior Court has, in granting or refusing a new trial, committed an error of law, that the jurisdiction of the Supreme Court arises.

An ordinary mind finds it difficult to discover an error of law in a judgment turning exclusively upon facts. Whether a certain amount of testimony does or does not, assuming the testimony all to be legal, establish a certain fact, would seem to have none of the elements of a legal question in it. But as the Judge is expressly authorized to grant new trials, on proper and legal grounds, it has been the uniform ruling that whilst this Court has no power over the verdict of a jury directly, yet, if a Judge refuse a new trial, when proper and legal grounds exist, or grant one when proper and legal grounds do not exist, he has committed an error of law. Our Code, section 3662, as one of the legal and proper grounds for granting a new trial, says, in any case, where the verdict of a special jury is found " contrary to evidence and the principles of justice and equity," the presiding Judge *may* grant a new trial before another special jury. And again: Section 3667—" The presiding Judge may *exercise a sound dis-*

Kelly *vs*. The State of Georgia.

*cretion* in granting or refusing new trials, in cases where the verdict may be decidedly and strongly against the weight of evidence, although there may appear to be some slight evidence in favor of the finding."

The result of both these sections is that if a verdict be contrary to the testimony and principles of equity and justice, the presiding Judge *may* grant a new trial. But in doing this or in refusing to do it, he exercises a sound discretion. His own judgment upon the facts is to be exercised. He has seen the parties, the witnesses, and the jury. He is one of the community—the vicinage—and he has in his breast the unwritten and unwritable history of the case, and standing, as he does, a sworn judicial officer, accustomed from his habits of life and his legal knowledge, to estimate the value of evidence—to judge of the credibility of witnesses, and to ascertain the principles of equity and justice, the law casts upon him a discretion to grant or refuse a new trial in cases where the verdict is contrary to evidence and the principles of equity and justice. And when a bill of exceptions comes here assigning error on the judgment of a Judge, in granting or refusing a new trial, it is not only the verdict of the jury that is to be reversed, but the discretion of the Judge. And the real question before us is, has the Judge *abused* his *discretion?* Has he shown a want of that fair, equal, calm consideration which the judgment of an officer so placed and so confided in should exhibit?

We wish to impress on the minds of the Judges that in all such cases we will take it for granted that they have *exercised* the discretion cast upon them, and that they have not, as is sometimes in argument stated by counsel here, decided without consideration, intending to cast the responsibility on this Court. We have none of this discretion cast by law on the Judge of the Superior Court, and we cannot interfere unless the case be one where the verdict is of such a character, under the evidence, that the judgment of the Judge in reference to it displays a want of that sound sense and judicial discretion properly and necessarily belonging to his high position.

We say this because we fear some of our Judges do not feel, as they ought, the responsibility cast upon them in this respect, and that they are too apt to pass hurriedly and carelessly on these motions, thinking that if they are wrong the bill of exception will secure a correction of the error.

With this view of the powers of this Court over the verdict of a jury, on the facts alone, we cannot bring ourselves to the conclusion that the present record presents a case for our interference. By the verdict of the jury the defendant did this horrid deed, and the Judge, in the exercise of his discretion, has set his seal to the verdict.

It is not with us a simple question of whether, in our judgment, he be the man or not. The question for us is, does the record present such a want of evidence as to authorize us to say not only that the jury have found a verdict against the weight of testimony, but that the Judge has abused his discretion in letting it stand. We do not think so. There is a great deal of evidence to sustain the verdict. It is, indeed, very difficult, nay, almost impossible, to conceive of so many indications of guilt, all pointing to this man, and yet he be innocent. God alone knows the secrets of the human heart. Society must judge and act on such rules as are necessary for its preservation. True, this evidence is circumstantial wholly, but the circumstances pointing to the guilt of Kelly are numerous. The jury have judged of the credibility of the witnesses, passed upon the plea of an *alibi*, and under their oaths have said they have no reasonable doubt of his guilt. It is not for us, under the facts set forth in the record, to say that the verdict shall be set aside as illegal, shocking to the moral sense, and displaying prejudice or mistake. We think an honest, fair-minded, intelligent jury might conscientiously come to the very conclusion this jury have done, and so thinking, we affirm the judgment of the Court.

By virtue, however, of the power granted us in section 4219 of the Revised Code, we shall direct that, after our judgment is made the judgment of the Court below, the prisoner be resentenced, the presiding Judge acting on the case according to

the discretion vested in him in cases of circumstantial evidence, and passing upon him sentence of death, or of imprisonment for life, accordingly as in his judgment the nature of the case, the public interests, the rights of humanity, and the liability of all men to be mistaken, may demand.

Judgment affirmed.