MINOR Y. GRIGGS, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant in error.

1. The official minute of a witness' testimony, before a committing magistrate is (where relevant) evidence against him, after the magistrate who presided and who made the minute has, in the case on trial, identified it as the original, and sworn to its correctness.
2. What a witness understood to be meant by certain motions of a wounded man, made while the latter was speechless and on the verge of unconsciousness, is not competent evidence, where the question assumes that something was meant, and where the understanding of the witness is sought[without either calling for his reasons or showing him specially qualified to interpret the motions referred to.
3. A scientific expert, who has observed none of the facts for himself, should give his opinion on a hypothetical case similar to that before the jury, and not on the actual case as if he were a juror instead of a witness.
4. The charge of the court, taken as a whole, is substantially correct. Though not entirely faultless, it is free from material error, both in matter and tone.
5. Such newly discovered evidence as the record sets forth, especially when no affidavit of the main witness is produced, is not cause for a new trial.
6. Where the evidence is circumstantial, and not plainly insufficient, the verdict should stand. Weighing the evidence and finding the truth in an obscure or doubtful case, is work that can usually be well done, *best done,* by a jury of the vicinage.

Criminal law. Evidence. Witness. Experts. New trial. Before Judge POTTLE. Hancock Superior Court. April Term, 1877.

An indictment was found against Minor Y. Griggs, W. R. Lovett and Columbus G. Barnes, charging them with the murder of Hiram F. Rozier, alleged to have been committed on February 10, 1877. Griggs was placed on trial. He pleaded not guilty.

The evidence for the prosecution presented, in substance, the following case: On the night of February 10th, 1877, (Saturday) between ten and eleven o'clock, Lovett was seen closing his store, in the town of Sparta. He walked with

one Stewart until they came to deceased's store, where he stopped and went in. Shortly after ten o'clock the defendant, Long, Young, Jenkins and Barnes, were together in an up-stairs room, when Lovett came in and asked defendant how long it would be before he would be ready to go. Defendant replied that he would be ready in a few minutes. Lovett said that he was in a hurry to go home. Defendant, Lovett, Barnes and Jenkins left together. Barnes came back at about 11 o'clock. There was nothing unusual in Lovett's coming for defendant, he had frequently done so before. Deceased was seen standing in front of his store, locking the door, at between 10 and 11 o'clock. He had a lantern in his hand and a basket on his arm. He was seen to walk from his store door to the gate, and then to go in the direction of home. The witness, Gobert, who last saw deceased and testified to these facts, also stated that defendant, Lovett and Barnes were not present at the time; that it was impossible for these men to have come along at the time he was conversing with deceased without his seeing or hearing them; that he was a little deaf; that he could not see how these men could have been fifteen or twenty steps behind him without his either seeing or hearing them, but, however, it might have happened; that he might have seen them and might not. Newman slept up stairs in the corner of his house towards deceased's, about $16\frac{1}{2}$ feet by measurement from the place on the ground where the lamp was broken and the blood found. He went to bed between 9 and 10 o'clock that night. Was aroused by the sound as of a drunken man tumbling down, and of some one pulling him away. There was a silence for awhile, and then it seemed as if he was dragged back to the steps. After the fall, and before the dragging, he recognized the voice of defendant and Lovett. Was well acquainted with them and has no doubt but that he heard their voices. This was about 11 o'clock. In the morning an examination disclosed blood, and the place where a lamp was broken. There was blood from this spot to the steps; also blood leading in the

direction of deceased's house. Some minutes after he heard defendant's and Lovett's voices, he heard others. Also heard groaning, but supposed it was by some drunken man who was in the hands of the marshal. Defendant was the marshal of the town.

At the coroner's inquest the defendant testified in substance as follows: At about half past ten o'clock on Saturday night, the 10th inst., witness, Lovett and Barnes came down main street, in the town of Sparta. As we passed deceased's store he stepped out and walked down the street towards his home. We stopped at Lovett's store and had been there about five minutes when we heard a noise at the front door; knew it was some one in distress. Lovett opened the door and witness stepped into the doorway. Deceased stumbled in and fell into the arms of witness; pulled witness by the lappel of his coat and pointed towards the baptist church. Witness, Lovett and Barnes went down the street with deceased. The latter made an effort to speak but could not do so. He led us to the place where he was struck, stopped, and made motions as if he wanted some one to go back to his store. Witness went. Deceased indicated by signs that he had been robbed; did not indicate how many were engaged in the robbery and assault, nor whether white or black; the only wound witness saw was that over the left eye.

Defendant's testimony at the preliminary trial of M. O. Boddy, charged with the murder, was introduced, in substance as follows:

On Saturday night last, at about 10½ o'clock, Lovett, Barnes and witness passed deceased's store, going to Lovett's. Deceased stepped out, locked his door, spoke to Barnes, and came on just behind us. His lantern was in his hand, and lit. Don't know what else. We then went in Lovett's store, etc., (same as before coroner). He (deceased) pulled me by the lappel of my coat, and motioned down towards Mr. Newman's shop. We stepped out of the door, when Lee Dago came up; Lovett caught hold of him and

asked him some questions. Deceased pulled Lovett away from Lee and motioned down the street again. Lovett and witness left Barnes to take care of deceased, and went to wake up his family. We returned towards him; when he came to the place where he was knocked down, he refused to go any further towards home. About this time Mr. E. A. Rozier (deceased's adopted son) and Rev. H. J. Adams came up. Deceased gave signs that he had been robbed and his keys taken. He motioned for some of us to go to his store. His son started, but deceased indicated that he did not wish him to leave, but made motions which we understood to mean that Lovett or witness must go. I went, and in a few minutes Eddie (deceased's son) came up, when we put another lock on the store, and returned. I asked deceased, at Lovett's store, what direction his assailant went? He responded by pointing down the street to the place where he was struck. I again asked him at Newman's shop, when he responded by pointing towards town.

Here the witness entered into a description of tracks found by him on the following Monday, leading from the place of the robbery. He stated that the peculiarity about this track was that it was very large, and the heel made rather deep indentations in the ground; that it was a square toed, thick soled shoe or boot that made the track. It was $11\frac{1}{4}$ or $11\frac{3}{4}$ inches long.

Found the lantern which deceased carried broken; it seemed to be stamped; saw indentations made by a large tack on the metalic portion. Was present when Moneghan (detective) examined defendant's boot. It had an incision in the center of the bottom of the sole, which contained something hard like glass or pebbles; handed my knife to Moneghan to take it out. It looked like a recent incission; it could not have been made without the employment of considerable force. (Boot handed witness). Tracks testified to could have been made with this boot. The incision (pointing to the one testified about) was the only one which seemed probably to have been made by glass. A man stamp-

ing his foot on a lamp chimney need not make any cut at all, and would not necessarily make a number of them.

Rev. H. J. Adams testified, amongst other things, that he first saw deceased on the night of the homicide, at Newman's shop; defendant, Lovett and Ed. Rozier were present; did not see Lee Dago at first, but saw him soon after his arrival.

Dr. A. F. Durham testified, in substance, as follows: Is a practicing physician; was called on, in that capacity, to see deceased on the night he was struck. He died about twelve hours after he was wounded. There were four injuries about his head and face. One was on the left brow, on the left parietal bone; one on the right parietal bone, one on the right temporal bone, and a slight abrasion on the left side of the face and nose. His death was caused by these injuries. Examined but one wound very carefully; that was on the left parietal bone. It was from two and a half to three inches long, one and a half to two inches wide, and oval in shape. I took out the bones, which came away in small pieces and fragments, showing that it was partially crushed. I recognize the bones shown me as those taken from the head of the deceased. The wound on the right parietal bone seemed to be similar in character to that described. Did not examine it so particularly, because the patient was in a dying condition. There was a depression about the wound on the temporal bone, but no appreciable break. There was a double-depressed fracture on the eyebrow ridge at point indicated by witness to the jury. In my opinion, the instrument inflicting the wounds must have been oval in shape, somewhat elastic in substance, or covered with some smooth, elastic substance. In my opinion, it does not seem that a man wounded as was deceased, could have walked, without assistance, from Newman's shop to Lovett's grocery, and back again, in five minutes. No argument has convinced me of this. It is mysterious to me how a man could walk at all with such wounds. Deceased was a spare man, rather delicately constituted. His constitution was somewhat dilapidated. Deceased, when wit-

ness saw him, was bloody about the face and hands; his clothing about the upper portion of his body was also bloody. After a man receives injuries of this character, the blood flows more freely immediately after the wounds are inflicted. Early on Sunday morning, when it was about light enough to see well, witness made an examination of the place of the homicide. There was blood from where fragments of glass were found to very near the door-steps. The blood appeared to have been dropped by a man standing in the attitude of one bleeding at the nose. Examined from Newman's shop to deceased's house. There were signs of blood sufficient to trace a bleeding man. At same time I examined the pavement from Newman's shop to Lovett's grocery; detected no blood on that examination. Examined the stone steps and door at Lovett's; found no sign of a drop of blood. A man wounded as was deceased, walking from Newman's shop to Lovett's grocery, would have dropped some blood on the ground, if not obstructed. It is witness' opinion that a man so wounded could not have fallen on another without leaving signs of blood on that person. It is my opinion that such injuries would have produced unconsciousness for awhile. It is one hundred and nineteen yards from Newman's store to Lovett's. When I reached deceased, he was unconscious. His limbs were more or less convulsed, or in a state of convulsion. He was unable to speak; his tongue was paralyzed. There is not any decided power of locomotion unless the party has pulse; a man cannot move much unless his blood is circulating. It was the concussion and compression of the brain which caused the rupture of the blood-vessels. So far as I was able to ascertain, all the blood came from deceased's nose. I judge that he was standing when he received the blow on his eye-brows. I think an oval-shaped " billie " might have inflicted the wounds. A sling-shot shaped like a guinea egg might have made them. It is possible that mental as well as physical reaction might have taken place between the time the wounds were inflicted and when I saw

deceased. If such reaction took place, it was followed by effusion of blood, which again produced unconsciousness. (Brass knuckles presented to witness.) Think the wound on the cheek may have been made with this instrument. The wound which broke the skull of the deceased was over the seat of an old wound which also fractured his skull.

Dr. W. L. Alfriend, who made a superficial examination of the wounds, corroborated Dr. Durham as to the inability of deceased to have walked to Lovett's grocery and back, after having received them.

Lee Dago testified, in substance, as follows: The first time witness saw defendant, Lovett and Barnes, with deceased, on the night of the homicide, was at Newman's shop. I was coming from Mr. Pierce's, and was on my way home. I did not meet any one between Lovett's bar-room and Newman's shop. It was impossible for me to have met any one in deceased's condition without noticing it. Did not go with deceased at any time that night from Newman's shop to Lovett's. Did not see defendant, Lovett and Barnes come out of Lovett's bar-room with deceased in the bloody condition described. Defendant came along there as if coming from this part of town. He went round the steps, stooped down and said, "Hiram, great God, what is the matter?"

On the following Monday evening, defendant, standing in the door of Lovett's bar-room, said to me: "Lee, you say you did not come back with Mr. Rozier to Lovett's barroom?" I told him, "Yes, I say so." Then he abused me terribly, cursed me, and drove me off. I said, "Mr. Griggs, I cannot say that and tell the truth, and I won't say it." He then came to me and said, "You G—d d—d old drunken son of a b—h, if you dispute my word I will kill you."

Thomas A. Young, sworn: Saw defendant on the night of the homicide with Barnes and Lovett, at the latter's barroom, at about 12 o'clock. I had been to deceased's house, and was returning to my room. Was sick from smelling blood, and stopped to get a drink of whisky. Noticed nothing strange in their manner. Remained five minutes or lon-

ger.   Defendant came out with me, and stood and talked.
He said that from some remarks made, he supposed that it
was McCall who committed the crime; that he had been to
his house that night and was not admitted.   Went on to my
room.   Have met defendant several times since at business
houses, and other places.   On one occasion, the night before
his arrest, at Long's store, he insisted on my going and tak-
ing a drink with him.   It was raining, and he urged me to
borrow an umbrella from Cothran & Watkin's store, to go
with him.   Thought that a little singular.   Other parties
were with me when he asked me to go and get a drink.

C. R. Jenkins testified, in substance, as follows: Was
in the room with Long and others, when Lovett came
for defendant, and accompanied them out.   Defendant asked
me to walk with him down town; we went down to Staser's
building.   A negro dance was going on down there.   Sup-
pose defendant went there in capacity of marshal.   Staser
accompanied us.   I walked with him, and thus became sepa-
rated from defendant, Lovett and Barnes.   About the time
I was opposite Shiver's store, they were turning the corner
in the direction of deceased's store.   Saw nothing more of
them until defendant reported to me that deceased was hurt.
At the time they passed deceased's store it was a little after 10
o'clock.   They were going in the direction of Lovett's.   Saw
nothing of deceased with a lantern when they passed.   I was
at O'Connor's corner; had a short talk with Staser there, and
while we were standing Lee Dago passed.   He was going in
the direction of Lovett's, same way that defendant, Lovett
and Barnes went.   From this point I went to Staser's cor-
ner with Mr. Staser.   On my return from there I saw some
one crossing Spring street; he came on to the sidewalk just be
hind me, and when I got back to O'Connor's corner, I saw it
was Dr. Pendleton.   I was at this last corner from one min-
ute to a minute and a half, when defendant came and in-
formed me of the injury to deceased.   Not more than fifteen
minutes had elapsed since I last saw him going in the direc-
tion of Lovett's; it might have been not more than ten.   It
is about the same distance from Shiver's bar-room to O'Con-

nor's corner that it is from the latter place to deceased's store. Saw splotches of blood on the right lappel of defendant's overcoat on Monday morning after the homicide. Did not see deceased at all that night until after he was hurt.

E. A. Rozier testified, amongst other things, as follows: When notified of the injury to his father, he went at once to Newman's shop, where deceased was reclining on the steps; defendant, Barnes, Lovett and Lee Dago were there. Adams subsequently came up. Searched deceased's pockets to see what was gone; pocket-book, with money and notes, pocket-knife, pistol, watch, tobacco and store key were all gone. I remarked that I had better go to the store to see about its security; some one said to me that deceased was unwilling for me to leave, and consequently I sent defendant. Soon thereafter Dr. Pendleton came up; I then went to the store and found defendant and Jenkins standing there talking; all the money had been taken from the drawer. When I first reached deceased his face and hands were bloody; "he pulled off as if he did not want to go from there, and as if he would ward them off from him." Found blood about there on the next morning. Examined at Lovett's bar-room at about 11 o'clock. There was no blood either on the door or door-sill there. Deceased had about him when robbed from $100.00 to $150.00. Have seen defendant frequently with a police club, a stick from one and one-half to two feet long, rounded, smooth, and made of hard wood. Have also seen him with a walking stick. Neither defendant nor Lovett gave me any account that night of the fracas, or of the deceased's going to Lovett's bar-room that I remember.

George S. Vardeman testified that he saw a pair of brass knuckles in the possession of the defendant some four weeks before the homicide.

J. B. Moneghan testified, in substance, as follows: Am a detective. About half-past eight o'clock on the Monday after the homicide, I reached Sparta. Saw defendant, who pointed out to me the place where deceased was knocked

down. Defendant then said he had to go over to attend the inquest as a witness. He pointed out the house where it was being held, and I said that as it was near they could call him, and insisted upon his walking down to the lower corner of the square. He appeared anxious to leave me. Defendant stated that he, Lovett and Barnes, were going down the street together; that as they passed deceased's door, he came out, locking the door, and spoke to Barnes about a sack of flour; that they walked on, deceased following them about ten steps behind; that they went into Lovett's bar-room, deceased passing the door as they were shutting it; that within five minutes some one knocked at the door, and that he, defendant, said, "My God! some one has hurt Jenkins;" that he and Lovett ran to the door, and as it was opened deceased staggered in, blood gushing from his nose and mouth, and his hands bloody; that he, defendant, asked who had robbed him, and he pointed to his pocket, and in the direction of Newman's; that he, Lovett and Barnes, ran out of the door, and Lovett caught hold of Lee Dago's coat and asked him why he had struck deceased; that deceased followed them out of the bar-room, caught hold of Lovett and pulled him away from Lee, shaking his head; that he and Lovett ran down the street past Newman's shop. Here witness asked him if they ran by the place of the homicide without discovering the overcoat, hat, basket and lantern. He replied that they did. On witness' remarking that two men could not run down the street abreast without striking some of these things, after reflection, he replied that they ran one behind the other. That when they were opposite deceased's house, Lovett notified the inmates, and as he was coming back to the opposite side of the street where defendant remained, Barnes called out to come back, that he had found the place; that they returned to Newman's, where Barnes and deceased were. Defendant showed me, on the day of my arrival, two or three drops of blood on the right lappel of his coat; he said that when deceased staggered in the door of Lovett's bar-room,

he got it off his hands. Examined Lee Dago's coat, but could find no blood on it. Defendant said that deceased walked back from Lovett's to Newman's, simply holding Barnes' arm. Saw no blood on Barnes' coat. Asked defendant one night, several days before his arrest, how many drops of blood he had told me there were on the steps at Lovett's? He replied that he did not remember telling me about it. Asked him if it was five or six drops that he had told me. He replied that it was one or the other. He told me in Dr. Alfriend's parlor that deceased was walking with his head bent over, as he came out of Lovett's, to keep the blood from dropping on his clothes. He also stated three times, distinctly, that he, Lovett and Barnes, had not met on the night of the robbery, after the homicide, to talk the matter over and to compare notes; that they had not met at all on that night after the murder. Defendant showed me a note that had been sent to the post-office. It was addressed as follows: "P. M.—Send at once to marshal Griggs or sheriff Jenkins." It read thus: "Had you not better look after Wixon?" Hs also showed me a note which had been shoved under Lovett's door. It was as follows: "Friend Dick,—Get out of the way at once. You are suspected. For God's sake, do it at once. B." Said he did not care a damn about the Wixon note, but would give $10.00 to find out who wrote the note to Lovett. After that, he asked me two or three times a day if I had found out who wrote this last note. On the Sunday before his arrest, he said he would give a G—d d—n sight more to find out who wrote to Lovett than to ascertain who killed deceased. For two or three days before his arrest he was very uneasy, and I could not get out of the sight of him, or of Lovett or Barnes. On the Monday night before the arrest on Tuesday, he was acting very disorderly; said that he could whip any G—d d—d man, white or black, who suspected him; that he was going to kill Lee if he said any more about not being back there where he said he was. On Tuesday morning he followed me around until a short time before his arrest. After his

arrest, he told me that his reason for following me was, that he intended to knock me down if I asked him another question about the Rozier matter; that he was going to whip or kill me any way before I got away from here; that he knew I suspected him from the middle of the preceding week. Searched Lovett's bar-room after the arrest, and found a pair of brass knuckles in the money-drawer.

It was admitted that the warrant against Boddie was sworn out by Griggs, and that Boddie was discharged.

Other evidence was introduced for the state, not deemed material. It was cumulative to the above.

The testimony for the defense made, in substance, the following case:

Drs. Campbell and Geddings, physicians and surgeons, testified, from a description of deceased's injuries, that in their opinion he could have walked from Newman's to Lovett's and back.

Dr. H. L. Burt testified, in substance, as follows: Saw deceased on the morning after he was wounded. Lower part of left parietal bone, and the upper part of the temporal bone, were cut into many fragments. There was another wound on the right parietal bone from one and a half to one and three-quarter inches long. There was a slight depression. Deceased was in a comatose condition. Don't think that the bones taken out were depressed upon the brain, because they were in such small fragments that none of them could have affected the brain to any considerable extent. The wound on his head caused his death by producing compression of the brain. Thinks the deceased could have walked, after receiving the injuries, one hundred and nineteen yards and back. The compression of which deceased died was caused by coagulation of blood on the brain. Do not think that the brass knuckles exhibited could have made so extensive a wound as I found on the left side of the head. It is more probable that they may have made the wound on the right. There was no cutting of skin or con-

tusion. Think these instruments would have cut the skin or bruised it.

Dr. P. T. Pendleton testified, in substance, as follows: Saw deceased at about 10½ o'clock on the night he was injured. Defendant told me of the injury. When I arrived Mr. Adams and Lovett were trying to get deceased home, but he pulled away from them up towards the store. He was standing, supported by Lovett and Adams. He staggered back and set down on Newman's steps. A slight spasm came over him, and he laid down, resting his elbow on the steps. He had little or no pulse. In a few seconds the spasm seemed to pass off, and he rose up to an erect position, sitting on the steps. He groaned several times, and wiped the blood off his face and beard with his hands. I insisted on his going home, but he refused by shaking his head and waiving his hands towards his store. In a few minutes Ed. Rozier returned from the store and told him that it was secure. I then caught him by his arm, and told him to go home. With my assistance, helping him a little, he rose to his feet, and walked two or three steps. I had hold of his arm, but supported him very little. He seemed to give way in his back, and fell on me. Lovett, Lee Dago and I then carried him home. Saw Lee Dago soon after I arrived at the place of the robbery; he may have been there when I came up. He seemed to be very drunk. Deceased died from compression of the brain, caused by coagulated blood. I think deceased could have been conscious after he was injured, and that he was conscious. I think he could have walked one hundred and nineteen yards and back. Do not think the brass knuckles shown me would have produced the wounds which killed deceased.

Other testimony was introduced, but is omitted as immaterial here.

The jury found the defendant guilty, but recommended him to mercy.

The defendant moved for a new trial upon the following, among other grounds.

1. Because the verdict is contrary to law and to justice.

2. Because the court erred in admitting in evidence the testimony of defendant, given in and reduced to writing on the preliminary trial of Boddie, charged with the murder of the deceased.

Before the testimony referred to in this ground was admitted, Frank L. Little was sworn in reference thereto, who testified as follows: I recognize the paper shown as my handwriting. This is the testimony of M. Y. Griggs, given in before me as the judge of the county court, when Boddie was on preliminary trial for the murder of deceased. I reduced his evidence to writing, and filed it with the clerk of the superior court. This is the brief of the evidence made by me. Don't see any alteration in it. Think it was read over to the witness; that was my habit. Can't recollect all of the testimony. The main facts I do remember.

3. Because the court erred in refusing to allow defendant to prove by E. A. Rozier, one of the witnesses for the prosecution, "what he understood deceased to mean by certain motions of his hands and head?" described by witness.

4. Because the court erred in refusing to allow defendant's counsel to read over to Dr. H. F. Campbell the evidence of Dr. Durham, describing the wounds of deceased, and then to ask him, "if those facts be true, what would be his professional opinion about deceased's consciousness, and ability to walk, immediately after receiving the wounds?" but required counsel to put only hypothetical cases to the witness.

5. Because of newly discovered evidence detailed in the following affidavit:

" STATE OF GEORGIA, Hancock county.

" Personally appeared, A. Miller DuBose, attorney at law for M. Y. Griggs, who, on oath, says, that on or about May 25th 1877, one Alexander, of Augusta, Ga., informed him that one John Enwright, who, at the time the murder of Rozier was committed, was in Augusta, but now, and at the time the information reached him, in the state of Massa-

chusetts, as he believed, gave to him a full account of the murder of Rozier, stating that he had taken two men to the depot in Augusta, and that they invited him to go with them to sparta, but he declined; that they were absent from Augusta from Friday before the murder until the Monday after; that they hid themselves in a box car, having no money and not wishing to be known; that they got off at a station near Sparta and laid in the woods twenty-four hours, and on Saturday night went into town and murdered and robbed Rozier; that the wounds were inflicted with an instrument of which he gave a full description; that the plan was all arranged a few weeks previous thereto by one of the men. That he had seen the pistol and the watch of Rozier, describing them to said Alexander, which description answers to that of the pistol and watch supposed to have been in deceased's possession; that they took from him $140.00. That Enwright insisted that he, Alexander, should write a letter to the sheriff of Hancock county, or to Mrs. Rozier, or to the son, saying that if a suitable reward was offered the actual murderers would be discovered; that he Alexander did write the letter as requested, and that such a letter was received by Mrs. Rozier. That Enwright remained in Augusta, to see if a reward would be offered, and seeing none in the paper, he left, giving Alexander his name and telling him how to find his whereabouts, saying also, that if a reward was arranged so that he might pay his expenses and make something for his time, he would come and swear to what he knew and find the murderers and the property. That just before leaving the city of Augusta he came again to Alexander and urgently requested that he should attend to the matter, saying that the men had been frequently in Alexander's store in Augusta, and that they had intended to kill him; that they were bad, wicked men, professional robbers, and he was afraid of them and wanted them out of the way. Deponent saw the handwriting and the name given to Alexander, and also discovered from George T. Barnes, Esq., that such a man as

Enwright had been in Augusta with Barnum & Co.'s circus, he having forclosed a lien upon the circus for him; that the name and the handwriting signed to the affidavit to foreclose the lien are the same as that given to Alexander. Deponent has sought to find out the whereabouts of said Enwright, and has so far failed, but he trusts and believes that said Enwright will come without any process to the next term of court; that this information was received too late to get him here by the present term, but he hopes and believes he can get him here by the next term. That he is informed that one Smith, a conductor of the Macon and Augusta R. R. Co., put two men off the train the night before Rozier was killed, at or near Culverton, and that Milton Rachels, Spence Hathaway and others, saw two strangers walking, and seeming to wish to avoid being seen, going towards Culverton about one o'clock on the night deceased was killed; that this information about the conductor has come to the knowledge of deponent recently; that Smith lives in this state, and can be brought here by the next court, this being the first term, and deponent not having had time to obtain this testimony at this term.

Sworn to, etc.

Defendant made the usual affidavit as to the testimony being newly discovered, etc.

Hathaway, Long and Reynolds made affidavit to the following facts: On the night Rozier was killed, between the hours of twelve and one o'clock, they were returning from Corfield's house, on Mason's plantation, to Spence Hathaway's, walking on the track of the Macon and Augusta Railroad Company, in the direction of Sparta, when, about one quarter of a mile from, and east of, Culverton depot, they saw two men approaching them on said road, walking rapidly, who left the track just before they met deponents, circled around them, returning to the track after deponents had passed. They appeared to be tramps; were carrying bundles on their shoulders.

Milton Rachels made affidavit to the effect that between

twelve and one o'clock, on the night deceased was killed, he saw, on the west side of Culverton depot, two men, strangers to him, rapidly walking down the track from the direction of Sparta; that they appeared to be tramps.

In reference to the last ground of the motion, E. A. Rozier made affidavit to the following facts: In a few days after the homicide of his father he went to Augusta to endeavor to find out the murderers. He was there shown a knife by a lieutenant of the police force, represented to have been taken from two tramps. It was not the knife which had been taken from his father. He also had a description given him by the chief of police, of a watch and pistol seen in the possession of said tramps. The description did not fit those taken from his father.

The motion was overruled, and defendant excepted.

B. H. HILL, SR.; A. M. & C. S. DuBose, for plaintiff in error.

SEABORN REESE, solicitor general; GEO. F. PIERCE, for the state.

BLECKLEY, Judge.

The prisoner was convicted, and sentenced to the penitentiary for life, the evidence against him being circumstantial. His motion for a new trial was denied. No material error of law appears in the record, and the evidence was sufficient to warrant the verdict. For the facts of the case, consult the reporter's statement, and for the rulings of this court on the various points presented, see the head-notes hereto prefixed. The charge of the court should be read and construed as a whole. Some of its parts are not faultless, but taken altogether, we think it substantially correct. In a few places it offers rather more assistance to the jury in general reasoning than it ought. In contemplation of law, jurors are well skilled in practical logic. 56 *Ga.*, 61; 58 *Ib.*, 36.

Cited by counsel for prisoner: (minute of testimony)

Code, §4999; (motions—opinion of witness) Code, §3867; 6 *Ga.*, 324; 31 *Ib.*, 424; 10 *Ib.*, 513; 12 *Ib.*, 257; (experts) Code, §3868; (certainty—8th ground of motion for new trial) Code, §3749; 6 *Ga.*, 284; (charge argumentative, etc., 9th, 10th, 11th and 12th grounds of motion for new trial) 58 *Ga.*, 36; Code, §3715; (new evidence) Code, §§3716, 3718; 31 *Ga.*, 34; 34 *Ib.*, 565; 37 *Ib.*, 676; 46 *Ib.*, 637; (verdict wrong) Code, §3749; 34 *Ga.*, 342; 46 *Ib.*, *supra*; 1 Stark. Ev., 575; 1 Gr. Ev., 13; 3 *Ib.*, 29.

Cited by the solicitor general: (certainty) 26 *Ga.*, 633; 1 Whar. Cr. Law, 732; 6 *Ga.*, 276; 18 *Ib.*, 265; 34 *Ib.*, 346; 38 *Ib.*, 295; 50 *Ib.*, 514; 22 *Ib.*, 235; (motions—opinion of witness) 6 *Ga.*, 324; 10 *Ib.*, 513; 18 *Ib.*, 194, 218, 220; 38 *Ib.*, 205, 297; 47 *Ib.*, 528; (experts) 31 *Ga.*, 424, 468; (false account given by prisoner) Bur. on Cir. Ev., 131, 132, 420; (verdict to stand) 49 *Ga.*, 18.

Judgment affirmed.