## PEOPLE v. BIHLER.

(Supreme Court, Appellate Division, First Department. January 10, 1913.)

1. CRIMINAL LAW (§ 178*)—FORMER JEOPARDY.

The inadvertent noting by the court, on the back of an indictment for libel, of the granting of a motion to dismiss, which motion was made with reference to an indictment for larceny against the same person, was not a valid dismissal of the indictment for libel so as to bar a prosecution therefor.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 326–329; Dec. Dig. § 178.*]

2. LIBEL AND SLANDER (§ 146*)—LIBEL—CRIMINAL RESPONSIBILITY—PLACE OF "PUBLICATION."

A libelous letter is published both in the place where it is posted in the mail and in the place to which it is addressed, the postmark being prima facie evidence that the letter was in the post office on the date of the postmark, so that the publication of a libelous letter addressed to one in Switzerland was complete when deposited in the post office in New York City with postage prepaid for its transmission to Switzerland.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 405; Dec. Dig. § 146.*

For other definitions, see Words and Phrases, vol. 6, pp. 5841–5846.]

3. CRIMINAL LAW (§ 97*)—LOCALITY OF OFFENSE—PLACE OF PUBLICATION OF LIBEL.

Under Pen. Code, § 16, making one punishable within the state for any crime committed in whole or in part therein, one who wrote and deposited in the post office in New York City a criminal libel addressed to another in a foreign country would be guilty of libel.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 177–189, 191; Dec. Dig. § 97.*]

Appeal from Court of General Sessions, New York County.

Charles Bihler was convicted of libel, and appeals. Affirmed.

See, also, 152 App. Div. 884, 136 N. Y. Supp. 1143.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, MILLER, and DOWLING, JJ.

William N. Cohen, of New York City, for appellant.

Robert S. Johnstone, of New York City, for the People.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

DOWLING, J.   Charles Bihler, the defendant, had been in the employ of Fenkart & Co., manufacturers of embroideries and laces, at St. Gall, Switzerland, from February, 1900, until the spring, 1901, when he was sent to their place of business in the city of New York, where he remained until February, 1906, when the relation of employer and employé between them ceased.   He then became interested in another concern, but in December, 1906, returned to his former firm as manager of the New York office, remaining in such capacity until July 1, 1908.   During this latter hiring there was discussion of a proposed partnership between Fenkart, Bihler, and one Wild, as the result of which Bihler had articles of partnership drawn up which did not meet with Fenkart's views, and he refused to sign same, by reason of which Bihler became incensed against Fenkart, and verbally and in writing gave utterance to threats indicating his purpose to see that harm came to Fenkart in revenge for his failure to execute the proposed articles. While the defendant was in this frame of mind, the events which are the subject of the charge against him occurred, and were followed by his statement to Ernest A. Bodenmann that he had "fixed" Fenkart so that he could not help himself any more, and that he would soon hear such developments that nothing could save him from going into bankruptcy.

Defendant had been in Switzerland, at St. Gall, in April, 1907, during the course of the negotiations for the new partnership, and while there had been introduced by Fenkart to his bankers, the Toggenburger Bank and the Credit Anstalt (formerly the Handel's Bank), whereof Leo Brittaeur was the representative.   The third bank with which Fenkart did business at the time in question was that of Messrs. Wegelin & Co.   On Saturday, November 27, 1907, defendant, who was then connected with the Bodenmann Manufacturing Company with offices at Weehawken, N. J., requested Lillian Stoeffer, a stenographer in his employ, to come to the office of the company on Sunday morning (the next day) to write some personal letters for him, and to furnish herself with plain paper and envelopes.   When she arrived there, about 11 o'clock on that morning, she found the defendant waiting, who asked her if she had plain paper and envelopes, to which she replied that she had brought the plain paper, and would procure the envelopes, which she did; thereupon the defendant handed her the draft of a letter, identified by the witness as being in his handwriting, and requested her to make three copies thereof, which she did and returned them to the defendant, who said that he would attach the slips himself that were referred to in the letters, and that he would mail them himself, and that he did not want anybody to have any copies.   At the time that defendant handed her the draft letter he also handed her three names to which the envelopes were to be addressed, viz., Wegelin & Co., St. Gall, Switzerland, Toggenburger Bank, St. Gall, Switzerland, and Leo Brittaeur, St. Gall, Switzerland. The witness identified the letters and envelopes produced upon the trial as those which she typewrote; the letters being copies of the draft in the defendant's handwriting handed by him to her, and the envelopes being the ones addressed by her to the three parties named.

The letter was the libel for the publication of which the defendant was convicted. The witness was corroborated by Ernest A. Bodenmann, who saw defendant hand the stenographer the draft letter, heard him ask her to make three copies of it, and to direct three envelopes, saw her typewriting the letters and deliver them when completed with the envelopes to defendant, and heard defendant tell her not to make copies thereof, as he wanted no one to have a copy, but that he would attend to the slips and the mailing himself. In the latter part of November, 1907, at 543 Broadway in the city of New York, Catherine Hand, employed by Fenkart & Co. at that place, was approached by defendant, who asked her if she had any plain writing paper. She stated that she had, and produced a sheet which she delivered to the defendant, inquiring if it would do, to which he replied in the affirmative. The defendant then directed her to write the name "Fenkart & Co." three times on that sheet of paper, and indicated the space to be left between the names. She typewrote the name as directed, and handed the paper with the name thrice written thereon to the defendant, asking at the same time if he wanted her to do anything with it, to which he answered that he would attend to that himself. The witness identified the slips produced by the prosecution as being the slips typewritten by her. We therefore have the proof of the passage into the possession of the defendant of three complete sets of paper, as follows: First, the libelous letter; second, the slip containing the name of Fenkart & Co.; third, an envelope directed, respectively, to each of the three parties to whom the libel was sent. The letter which the defendant was at such great pains to concoct, and the object of whose attack was sought to be concealed by the method followed in its preparation, was as follows; the only difference in the three copies being in the name of the person to whom it was directed:

"Messrs. Wegelin & Co., Bankers, St. Gall, Switzerland.

"Dear Sirs: We wish to inform you for your own benefit that the firm as per attached slip, is in a bad financial condition, they owe their bankers (commission house) nearly $250,000, who hold a lien on their entire stock, everything tangible is assigned to their bankers, and while the contraction in values of late has taken also some proportions in the commodity they deal in and manufacture, their equity here is next to nothing.

"There are also an attachment suit and several other litigations hanging over them, which may at any moment come off, and which they will very likely lose (you undoubtedly know what results law suits here usually lead to) so that you stand a good show of seeing another Johannes Rohner case very shortly; we understand that this party is making statements to his bankers in St. Gall regarding his financial standing in New York entirely at variance with the facts.

"If this illumination of facts will be of any benefit to you we shall be pleased.      Yours,                  Friends."

To this letter there was attached a slip containing the words: "Fenkart & Co."

The next time that the letters were heard of was on December 4, 1907, at which time the three envelopes, letters, and slips had reached St. Gall, Switzerland, and had passed into the custody of the persons to whom they were directed, and were seen there by Charles Fenkart.

At that time each envelope bore the postmarks "New York, N. Y., 1907—Sta. E.—Nov. 25—11 P. M.," and "St. Gallen, 3, xiii, 07, 12, Brf. Exp." Each of the envelopes also had upon it a canceled 5-cent United States postage stamp. It was shown by the officials of the Post Office Department that each letter had been through the usual and proper channels from its deposit in a letter box in the territory of station E, and that the various marks thereon indicated its transmission through the mails in the ordinary manner. We thus have the completion of the transaction by the appearance, in the possession of those to whom the libels are intended to be mailed, after their actual transmission through the mails of the libels prepared under defendant's direction and passed into his custody. There has been no attempt made to explain the way in which these libels passed out of the custody of defendant, nor any attempt to break the force of the testimony which points irresistibly to the defendant's having carried out his statement to witnesses that he would attend to the mailing of the letters and slips himself. We are unable to see how the jury could have reached any other conclusion upon this evidence than that of the defendant's guilt.

[1] The questions urged upon this appeal are: First, that the defendant was entitled as a matter of law to the dismissal of the indictment against him because it had once been dismissed by a judge of the Court of General Sessions; second, that the crime of publishing a libel in the county of New York was not established; third, that the facts proved established that the libel was published in St. Gall, Switzerland. The defendant's first contention is based upon the following facts: The defendant was under two indictments, the one in question for libel numbered 68,429, and one for grand larceny in the first degree numbered 65,082. On January 21, 1909, application was made to the judge presiding in Part I of the Court of General Sessions for the dismissal of the grand larceny indictment. The application was granted, and an order to that effect made by the court and entered in the minutes. The grand larceny indictment was thereupon sent for to the clerk's office, but by mistake the libel indictment was sent up instead, and the clerk inadvertently wrote upon it the memorandum "P. I. Jan. 21/09, On Motion of District Attorney Indictment Dismissed," which the judge initialed. It was immediately discovered, however, that the wrong indictment had been sent from the clerk's office, and the correct one was thereupon sent for and the proper memorandum indorsed thereupon and initialed by the judge. The memorandum which had been written on the libel indictment by mistake was crossed out by drawing ink lines through it, and the initials of the judge erased with his knowledge and approval. There was no attempt made to controvert these facts. The only indictment for the dismissal of which an order had been made was that for grand larceny to which the motion had been directed. No motion was ever made to dismiss the indictment for libel nor was any order to that effect ever made. The indictment for libel was not before the court for consideration in any way. Under these conditions it must be apparent that a mere inadvertence or mis-

take unconsciously made by the court in initialling upon the back of an indictment the granting of a motion to dismiss, which had not been made with reference to it but to a different and existing indictment against the same person, cannot be made use of as a valid dismissal. No order was ever made dismissing the indictment for libel, and it still remained in full force and effect when the present trial took place.

The second and third propositions may be discussed together. It is the contention of the appellant that there was no publication of the libel in question until the letters reached Switzerland and were opened there; in other words, that no part of the crime was committed within the state of New York, and that therefore the offense is not cognizable here. At the time of the commission of the offense in question, the provisions of the Penal Code relative to libel, so far as they are involved in the present appeal, were as follows:

"Sec. 242. A malicious publication, by writing, printing, picture, effigy, sign or otherwise than by mere speech, which exposes any living person, or the memory of any person deceased, to hatred, contempt, ridicule or obloquy, or which causes, or tends to cause any person to be shunned or avoided, or which has a tendency to injure any person, corporation or association of persons, in his or their business or occupation, is a libel.

"Sec. 243. A person who publishes a libel is guilty of a misdemeanor."

"Sec. 245. To sustain a charge of publishing a libel, it is not necessary that the matter complained of should have been seen by another. It is enough that the defendant knowingly displayed it, or parted with its immediate custody, under circumstances which exposed it to be seen or understood by another person than himself."

Section 16 of the Penal Code as then existing was as follows:

"The following persons are liable to punishment within the state: 1. A person who commits within the state any crime in whole or in part."

Section 683 of the Penal Code provided as follows:

"In the various cases in which the sending of a letter is made criminal by this Code, the offense is deemed complete from the time when such letter is deposited in any post office or other place, or delivered to any person, with intent that it shall be forwarded. And the party may be indicted and tried in any county wherein such letter is so deposited or delivered, or in which it is received by the person to whom it is addressed."

The foregoing provisions are to be found in the present Penal Law numbered, respectively, sections 1340, 1341, 1930, and 550.

[2] The rule with regard to the place of publication of a libel is thus stated in Odgers on Libel and Slander (5th Ed.) p. 728:

"It is, however, necessary in a criminal case to further prove that the prisoner published the libel in the county in which the venue is laid. However, if the defendant write a libelous letter and cause it to be posted, that letter is published both in the county where it is posted, and in the county to which it is addressed, if it be opened there."

He further lays down the rule that:

"The postmark is sufficient prima facie evidence that the letter was in the post office on the date of the mark." Id. p. 728; Wigmore on Evid. §§ 95, 151; Lawson on Presumpt. Evid. p. 69.

So the same author further says on page 675:

"If the defendant wrote a libel, which is in some way subsequently published, this is prima facie at all events a publication by the defendant. Per Holt, C. J., in R. v. Beere, 12 Mod. 221; 1 Ld. Raym. 414. A letter is published as soon as it is posted, provided it ever reaches the party to whom it is addressed, and this will be presumed if there is no evidence to the contrary. Thus, if a letter in the handwriting of the defendant be produced in court with the seal broken and the proper postmarks outside, that is sufficient prima facie evidence of publication."

The leading case cited is that of The King v. Sir Francis Burdette, Bart. 4 B. & Ald. 95. There the libel in question was written and posted in Leicestershire and delivered in the county of Middlesex, and, while there was no proof nor trace of a seal or postmark on the open envelope, it was held by the justices, with one expressing doubt, that a delivery at the post office at Leicestershire of a sealed letter inclosing a libel was a publication of a libel in Leicestershire, and it was further held that, where the defendant wrote and composed a libel in Leicestershire with the intent to publish it in Middlesex, he might be indicted for a misdemeanor in either county. Best, J., in answering the contention that there was no evidence that the libel was published in the county of Leicestershire, said:

"It must be borne in mind that the question is not whether the evidence was such as ought to have satisfied a jury of the fact of publication in Leicestershire, but whether any facts were proved, which raised a presumption of publication in that county. If there were any such fact, I could not deal with them otherwise than I did. I am of opinion that there was evidence in this case, on the part of the prosecution, which raised a strong presumption that the libel was published in Leicestershire; and, no attempt having been made to rebut such presumption, it became in my mind conclusive proof of that fact. [Page 121.] * * * So in the case of a libel publication is nothing more than doing the last act for the accomplishment of the mischief intended by it. The moment a man delivers a libel from his hands, his control over it is gone. He has shot his arrow, and it does not depend upon him whether it hits the mark or not. There is an end of the locus pœnitentiæ, his offense is complete, all that depends upon him is consummated, and from that moment upon every principle of common sense he is liable to be called upon to answer for his act. Suppose a man wraps up a newspaper and sends it into another county by a boy; who is the publisher? The boy, who perhaps cannot read, or is ignorant of its contents, or the man who has put it up in the envelope? The boy who carries it is merely an innocent instrument. There can be no other publisher but the person who sent it, and he publishes it when he delivers it to the boy. If the sending of a letter by the post be not a publication in the county from whence it is sent, how is the libeler to be punished who sends his libel by the post to some foreign country for circulation? The libeler will not go to the foreign country that he may be punished there. If the sending it from England be not publication (as is contended at the Bar), can it be insisted, when the libel is completed by publication, that such a libeler can nowhere be punished? [Pages 126, 127.]"

The learned justice discussed the subject at considerable length, and pointed out that the theory of the common law, of which the civil law was strongly confirmatory, was that "publication" means "the act of delivering, which precedes the manifestation of the contents," and he refers to several cases which supported his conclusion that "the putting of a letter into the post is a sufficient publication." Pages

127, 128. Holroyd, J., also held that, as soon as a manuscript of a libel had passed out of the defendant's possession and control, it was deemed to be published, so far as the defendant was concerned. He stated:

"But whether it was sent away or parted with by the defendant in Leicestershire, open or sealed, makes, in my opinion, no difference with respect to the question whether it was in point of law published by him in that county or not, so far as to give the jury of that county jurisdiction over that fact. In 5 Co. Rep. 126a, it is laid down, that a scandalous libel may be published traditione, when the libel, or any copy of it, is delivered over to scandalize the party. So that the mere delivering over or parting with the libel with that intent is deemed a publishing. It is an uttering of the libel, and that I take to be the sense in which the word publishing is used in law. Though in common parlance that word may be confined in its meaning to making the contents known to the public, yet its meaning is not so limited in law." Page 143.

He also discusses the matter at considerable length, and points out emphatically that the mere parting with the libel by which the defendant loses his power of control over it is an uttering and publication thereof; that the act of another person afterwards in reading the libel does not alter the defendant's criminality or the nature of his act in the county where he parted with it with criminal intent. Abbott, C. J., was of the same opinion. He also held that the publication of a libel did not mean an actual communication of the contents of the paper, but that a libel might be published by delivery, and that the parting with the letter by the defendant in the county of Leicestershire constituted a publication.

This case was cited with approval by Coleridge, L. C. J., in R. v. Holmes, 15 Cox C. C. 343, where he said:

" * * * It was held in Rex v. Burdett, 4 B. & Ald. 95, and other cases that the delivery at the post office of a sealed letter inclosing a libel is a publication of the libel at the place of posting." Page 344.

In United States v. Smith (D. C.) 173 Fed. 227, 232, it was held where the defendants printed copies of a newspaper containing an alleged libelous article in the city of Indianapolis, and deposited them in the United States post office there, to be transmitted by mail to subscribers in Washington, the jurisdiction was in Indianapolis, Ind., for there the publication took place and was complete. That was a specific question presented in the case, and the court held as indicated, further stating:

"Where people print a newspaper here, and deposit it in the post office here, for circulation throughout other states, territories, counties, and districts, there is one publication, and that is here."

In Mills v. State, 18 Neb. 575, 26 N. W. 354, it was held that a libelous charge made by the defendant against a person contained in a letter written and mailed in the state of Nebraska to a person in West Virginia was sufficient to render the defendant liable in the state of Nebraska for the offense. This is not an unconsidered holding, for the court stated that were it not for error in another respect, an affirmance of the judgment would result.

In Youmans v. Smith, 153 N. Y. 214, 218, 47 N. E. 265, 266, the court said:

"Printing a libel is regarded as a publication when possession of the printed matter is delivered with the expectation that it will be read by some third person, provided that result actually follows."

In 18 Am. & Eng. Ency. of Law (2d Ed.) p. 1015, it is stated in defining what constitutes a publication that:

"The general rule is that any communication by one person to another or others of defamatory matter concerning a third person, or the doing of any act intended to result, or which would naturally result in the exposure of the contents of the libel to any person other than the author, is a publication within the meaning of the term as used in the law of libel and slander." Page 1013.

"A person who sells or delivers libelous matter to another or others or parts with the possession and custody of the same under circumstances which expose it to be read or seen by another or others is chargeable with the publication thereof. * * *" Id. p. 1014.

"The sending to one person of a private letter containing matters defamatory of another, constitutes a publication, and it has been held that the mere depositing of a letter containing such matter in the post office would be a publication of it, though it never came to the hands of him for whom it was intended, if it came to those of anyone else, because a wrongdoer is answerable for all the consequences of his acts." Id. p. 1015.

It will be found that Rex v. Burdett has received general acceptance as stating the common law on the question of what constitutes publication of a libel. Among other cases in which it was expressly followed is Giles v. State, 6 Ga. 276. In the draft of the Penal Code prepared by Commissioners David Dudley Field, William Curtis Noyes, and Alexander W. Bradford, dated March, 1864, and submitted for public examination and suggestion prior to revision by the commissioners, the following section was proposed:

"313. To sustain a charge of publishing a libel it is not needful that the words complained of should have been read by any person. It is enough that the accused knowingly parted with the immediate custody of the libel under circumstances which exposed it to be read by any other persons than himself."

The note to this section gives as the authority for its provisions Giles v. State, in which the case of Rex v. Burdett was expressly approved and followed.

When thereafter, under date of December, 1864, the commissioners submitted their proposed Penal Code to the consideration of the Legislature, section 313 remained unchanged save for the substitution of "another" for "any person" in the first sentence. Section 245 of the Penal Code is in the precise language of the last proposed section 313. So that the real basis of the present Code provision as to the publication of a libel is Rex v. Burdett, and, as we view it, that publication was complete when the libel was deposited in the post office in New York City, directed to a third person, and with the postage prepaid for its transmission to him.

[3] Even if this were not so, we think the provisions of section 16 of the Penal Code would have been sufficient upon the facts in this case to have justified the defendant's conviction, for, if it were held that the whole of the act of publishing the libel had not been com-

pleted when the same was deposited in the mail, it certainly was committed in part by such deposit, for the mailing of the letter was the first step in the process of publication and an essential step therein, without which publication would not have been possible. Nor is there anything inconsistent with our scheme of statutory enactment in the punishment within this state of an offense committed here in part. By section 16 of the Penal Code (based on section 15 of the Field Penal Code as reported in 1864), all persons were liable to punishment within the state, if, first, they commit within the state any crime in whole or in part; second, if they commit without the state any offense which, if committed within the state, would be larceny under its laws, and they are found with any of the stolen property within the state; third, if, being without the state, they cause, procure, aid, or abet another to commit crime within the state; fourth, if, being without the state, they abduct or kidnap any person by force or fraud contrary to the laws of the state where the act was committed, and bring, send, or convey such person within the limits of the state and he is afterwards found therein; and, fifth, if being without the state and with intent to cause within the state a result contrary to the laws of this state they do an act which in its usual course results in an effect contrary to its laws. These last four subdivisions are, in effect, enactments provided for in proposed section 12 of the Graham Draft Code of Criminal Procedure reported to the Legislature December 31, 1849, which reads as follows:

"When the commission of a public offense commenced without this state is consummated within the boundaries thereof the defendant is liable to punishment therefor in this state, although he were out of the state at the time of the commission of the offense charged, provided he consummated the offense through the intervention of an innocent or guilty agent within this state, or by any other means proceeding directly from himself; and in such case, the jurisdiction is in the county in which the offense is consummated."

And so, in the proposed Field Code, the revisers expressly declared that the jurisdiction of the state over offenses planned or in part committed outside its boundaries ought to be inserted in the Code unless elsewhere enacted. Thus we have as a result of consistent legislative enactment jurisdiction, first, over offenses commenced outside the state where the results or victim of the acts specified are brought within the state, and also over offenses initiated outside the boundaries of the state and consummated within its boundaries by agents of the instigating party; and, second, over offenses commenced within the state and completed elsewhere.

We have examined the whole record, from which it clearly appears that the defendant had a fair and impartial trial at which his rights were adequately protected by his counsel; that no reasonable doubt could exist as to his guilt of the offense with which he was charged; that the letter complained of was clearly libelous; and that, when he deposited the libelous matter in the mail for transmission to third parties with an intent that it should be seen by them, his guilt was complete.

The judgment appealed from will therefore be affirmed. All concur.