# SUPREME COURT — APPELLATE DIVISION — FIRST DEPARTMENT.

## July 13, 1917.

## THE PEOPLE v. WILLIAM J. BURNS.

(178 App. Div. 845.)

PENAL LAW, SECTION 533—TAKING AND PUBLISHING LETTERS OR PAPERS WITHOUT AUTHORITY.

Where a banking firm, acting as fiscal agent of foreign countries and engaged in the purchase of munitions for them and in daily receipt of a large number of confidential cablegrams, discovered that so-called munition brokers, having desk room in a lawyer's office, were obtaining information as to the contents of said telegrams, and thereupon engaged the services of a licensed private detective, said detective, who, while in the lawyer's office for the purpose of installing a detectaphone, caused unsealed letters to the munition brokers by dealers in war munitions and certain other unsealed papers, copies of letters sent by munition brokers to dealers, to be copied in shorthand by his secretary and later transcribed and delivered to an employee of the banking firm which was prosecuting the inquiry, is not guilty of opening or publishing the letters or papers without authority in violation of subdivision 3 of section 553 of the Penal Law.

SAME.

In order to violate said subdivision a person must both "take" a paper or a copy thereof and also "publish" it.

SAME—WHEN PRIVATE DETECTIVE NOT LIABLE FOR VIOLATION OF STATUTE—"PUBLISHING."

The delivery by the private detective of the copies of the letters to a single individual, his employer, who had a legitimate interest in knowing what use was being made of the information stolen from his office, and who was not interested in giving general publicity to the facts, did not constitute "publishing" within the meaning of the statute.

DOWLING, J., dissented, with opinion.

APPEAL by the defendant, William J. Burns, from a judgment of the Court of Special Sessions of the City of New York, Part VI, rendered against him on the 26th day of January,

1917, convicting him of violating subdivision 3 of section 553 of the Penal Law.

*James M. Beck,* for the appellant.

*Robert S. Johnstone,* for the respondent.

SCOTT, J.:

The defendant appeals from a conviction in the Court of Special Sessions of the crime of violating subdivision 3 of section 553 of the Penal Law.

The material facts disclosed upon the trial may be briefly summarized as follows:

In the latter part of 1915 and the early part of 1916 the banking firm of J. P. Morgan & Co., of the city of New York, was the fiscal agent in this country of both Great Britain and France, and in that capacity were engaged in making large purchases of munitions of war and other articles required by said foreign countries in the prosecution of the great war in which they are now engaged. In the course of this business they received daily a large number of cablegrams of a highly confidential nature, most of which were in code. At a certain time the firm became convinced that there was a leak somewhere in their office, and that outside persons, who had no right to do so, were obtaining information as to the contents of cablegrams received by the firm, and were dealing upon the information so obtained for their own advantage. The firm thereupon engaged the services of defendant, a duly licensed private detective, of much experience and of good repute, to ascertain how the information leaked out of their office and by whom it was received and acted upon. It was soon discovered that the information was being used by four persons calling themselves "munitions brokers," and who occupied desk room in the offices of a firm of lawyers located in the Equitable Building,

a large building in the city of New York. The main purpose of the inquiry was to learn from whom in the banker's office the information came, and to this end defendant leased an office next to the lawyers' office, and arranged with the superintendent of the building to gain access at night to the lawyers' office and to install therein a detectophone. While in the office on this errand, defendant found lying on a desk certain unsealed letters to one or other of the munitions brokers by dealers in war munitions, and certain other unsealed papers which were apparently copies of letters sent by the munitions brokers or one of them to said munitions dealers. While these papers did not serve to disclose who was furnishing the information from the bankers' office, they did serve to disclose the use that was being made by the so-called.brokers of the information obtained by them. It afterwards transpired that the information had been obtained by corrupting certain of the bankers' clerks. Defendant did not remove any of the papers above described from the offices in which he found them, but caused his secretary, who accompanied him, to copy them in shorthand, and later to write them out in long hand or typewriting. These long hand or typewritten copies were delivered to one Egan, an employee of the banking firm, who had engaged defendant and was charged with prosecuting the inquiry. It does not appear that defendant communicated the contents of these papers to any other person, or that Egan made them public.

The statute under which defendant was convicted reads, so far as pertinent, as follows:

" § 553. Opening or publishing a letter, telegram or private paper. A person who wilfully, and without authority: * * *

" 3. Takes a letter, telegram or private paper, belonging to another, or a copy thereof, and publishes the whole or any portion thereof; * * * Is guilty of a misdemeanor."

It is apparent that to violate this section a person must both " take " a paper or a copy thereof, and must also " publish " it. To " take " without publishing, or to " publish " without taking, does not constitute a violation of this particular subdivision. Both of these words are subject to construction. If by " take " the Legislature meant asportation the defendant did not offend against the section in this particular, for he did not take any paper away, even temporarily. It would seem that the word must be thus construed, for otherwise it would be inappropriate. It is true that making a copy is sometimes spoken of as " taking " a copy, but this is not the usual sense in which the word is used, and is wholly inapplicable to original papers.

The argument at bar, however, chiefly turned upon the meaning to be attached to the word " publish," for even if defendant did " take " the letter and copies he was not guilty unless he also published them. What he did was to deliver the copies to a single individual, his employer, who had a legitimate interest in knowing what use was being made of the information stolen from his office, and who was certainly not interested in giving general publicity to the facts. The question is whether or not this constituted " publishing " the letters and copies. We think not. The words used in criminal, as well as civil statutes, are to be given, as a general thing, the common, usual meaning, and in a criminal statute especially the words are not to be extended to cases not clearly within them. (Sherwin v. People, 100 N. Y. 351, 361, 3 N. Y. Crim. 524; People v. Nelson, 153 id. 90, 94, 12 N. Y. Crim. 368.) The word " publish " as commonly understood means to give to the public, and is usually associated with printing by pamphlet or newspaper. As was said in United States v. Williams (3 Fed. Rep. 484, 486): " The idea of publicity, of circulation, of intended distribution, seems to be inseparable from the term ' publication.' " Even

a communication to a considerable number of persons, for a special purpose, is not always considered a publication. Thus business circulars, sent out only to persons engaged in or supposed to be engaged in the trade to which the circulars refer, are not deemed publications (New Process Fermentation Co. v. Koch, 21 Fed. Rep. 580), nor is the representation of an unprinted play to persons especially selected considered a publication under the copyright laws (Keene v. Wheatley, 14 Fed. Cas. 180, 199.) In the latter case the court said: "When the word ' publication ' is used without an express qualification, a general publication is usually meant."

The learned district attorney insists that the word " publish " in the subdivision under consideration must be construed as it is construed in libel cases, and that the communication of the contents of a private paper to but a single person constitutes publication thereof. We see no reason, in the statute itself, for giving this very unusual construction, which is peculiar to the law of libel. Indeed, the Penal Law (§ 1343) compels that construction in a prosecution for libel, but omits to do so in reference to the crime for which this defendant was convicted.

We are, therefore, of the opinion that defendant was not shown to have technically violated the statute under which he was convicted. In reversing his conviction, however, we must not be understood as commending or justifying his act in obtaining access by surreptitious means into the office occupied by the " munitions brokers," and in reading and copying papers which he found there.

All we are concerned with is whether or not he was legally convicted of the charge upon which he was tried. For the reasons above given we think he was not. The judgment of conviction is, therefore, reversed and the defendant discharged.

SMITH, PAGE and SHEARN, JJ., concurred; DOWLING, J., dissented.

DOWLING, J. (dissenting):

The inviolability of one's private papers from seizure or even inspection (save under due process of law) was declared as far back as Entick v. Carrington (19 Howell's State Trials, 1029), where plaintiff was given judgment against three messengers in ordinary to the King for entering his dwelling house, searching into his private books and papers and carrying away certain printed pamphlets and charts. Lord CAMDEN said therein:

" By the Laws of England, every invasion of private property, be it ever so minute, is a trespass. No man can set his foot upon my ground without my license, but he is liable to an action, though the damage be nothing; which is proved by every declaration in trespass, where the defendant is called upon to answer for bruising the grass and even treading upon the soil. If he admits the fact, he is bound to show by way of justification, that some positive law has empowered or excused him. The justification is submitted to the judges, who are to look into the books; and if such a justification can be maintained by the text of the statute law, or by the principles of common law. If no such excuse can be found or produced, the silence of the books is an authority against the defendant, and the plaintiff must have judgment.

"According to this reasoning, it is now incumbent upon the defendants to show the law by which this seizure is warranted. If that cannot be done, it is a trespass.

*"Papers are the owner's goods and chattels; they are his dearest property; and are so far from enduring a seizure, that they will hardly bear an inspection;* and though the eye cannot by the laws of England be guilty of a trespass, yet where private papers are removed and carried away, the secret nature of those goods will be an aggravation of the trespass, and demand more considerable damages in that respect."

In Boyd v. United States (116 U. S. 616) Mr. Justice

BRADLEY, in discussing the case of Entick v. Carrington, said: It "will always be celebrated as being the occasion of Lord CAMDEN's memorable discussion of the subject; * * * the law as expounded by him has been regarded as settled from that time to this, and his great judgment on that occasion is considered as one of the landmarks of English liberty. It was welcomed and applauded by the lovers of liberty in the Colonies as well as in the mother country. It is regarded as one of the permanent monuments of the British Constitution, and is quoted as such by the English authorities on that subject down to the present time."

And further (p. 630): "The principles laid down in this opinion affect the very essence of constitutional liberty and security. They reach farther than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all invasions on the part of the government and its employees of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offence; but it is the invasion of his indefeasible right of personal security, personal liberty and private property, where that right has never been forfeited by his conviction, of some public offence,— it is the invasion of this sacred right which underlies and constitutes the essence of Lord CAMDEN's judgment." (See, also, Weeks v. United States, 232 U. S. 383, and Flagg v. United States, 233 Fed. Rep. 481.)

A consideration of the gradual growth of the statutory provisions in the State of New York for the protection of private letters and papers will show that the uniform tendency has been to enlarge the scope of the prohibited acts and not to restrict them. The earliest decision on the subject was rendered by the New York General Sessions in 1818 (Noah's Case, 3 City Hall Recorder, 13). It was there said (p. 20): "Upon these principles, and the best consideration we have been able

to give this subject, the court is of opinion, that the breaking open and publishing a private letter is a misdemeanor, and therefore indictable.

"The correspondence by letter has become very extensive and important. Next to that of personal intercourse, it is a medium of communication the most general and interesting of any that exists in a civilized community. It may relate to matters of friendship, of business, and to all the concerns of human life, whether of a public or private nature. A letter is usually protected by a seal, to guard it against public inspection, and by the common consent of the world, this seal is held to be sacred. It is the interest of every man in the community, that it should be so, and to permit it to be violated with impunity, would lead to incalculable evils, and strike at the root of all public and private confidence.

"If, therefore, the proof in this case can support the charge that the defendant broke open this letter, or, which would amount to the same thing, if he had any agency, directly or indirectly, in doing it, in the opinion of the court, he ought to be found guilty. The direct evidence of the witnesses on the subject is, that it was found open on the floor of his office; but it is contended by some of the counsel for the prosecution, that there are circumstances which go to show that he must have had an agency in procuring and breaking open the letter. If there be circumstances to satisfy you on this, according to the opinion we have expressed, the indictment would be sustained; otherwise, the defendant ought to be acquitted."

This decision was based on what were deemed settled principles of criminal law, though unsupported by any cited precedent. But this ruling was not deemed sufficiently broad to cure the evil of interference with private letters, and so in 1828 it was provided, to take effect on January 1, 1830, as follows (2 R. S. 695):

"§ 27. If any person shall wilfully open, or read, or cause

to be read, any sealed letter, not addressed to himself, without being authorized so to do, either by the writer of such letter, or by the person to whom it shall be addressed, he shall, upon conviction, be adjudged guilty of a misdemeanor, and shall be punished by a fine not exceeding one hundred dollars, or by imprisonment not exceeding one month.

" § 28. Whoever shall maliciously publish the whole or any part of such letter, without the authority of the writer thereof, or of the person to whom the same shall be addressed, knowing the same to have been so opened, shall, upon conviction, be adjudged guilty of a misdemeanor, and punished as prescribed in the last section."

By chapter 871 of the Laws of 1867, section 27 was amended so as to read:

" § 27. If any person shall willfully open, read or cause to be opened or read, any sealed letter or telegraphic dispatch or message not addressed to himself, without the permission of the person to whom it shall be addressed or of the writer thereof, or other person having the right to give such permission, he shall, upon conviction thereof, be adjudged guilty of a misdemeanor, and shall be punished by a fine of not less than three hundred dollars or imprisonment not less than three months, or both such fine and imprisonment. And any person who shall aid, abet or encourage the opening or reading of any such letter, telegraphic dispatch or message, shall be deemed guilty of a misdemeanor, and, upon conviction, shall be punished as herein above provided."

By the same chapter the provisions of chapter 340 of the Laws of 1850, relative to the disclosure of telegrams by employees of telegraph companies, were amended so as to bring within its provisions telegraphic dispatches or messages within the scope of section 27 before cited.

When the Penal Code was adopted in 1881 (Laws of 1881, chap. 676), the first two subdivisions of the present statute only

were included (§ 642), and in their then form these did not refer to a " private paper " which was included within the statute by chapter 287 of the Laws of 1895, which also added subdivisions 3 and 4 of the present law. Subdivision 5 was added by chapter 588 of the Laws of 1900, and subdivisions 6 and 7 by chapter 441 of the Laws of 1905. We thus have the law in its present state. (Penal Law, § 553.)

There is no attempt to defend the action of this defendant. He arbitrarily and recklessly violated the rights of the persons into whose premises he secured admission by the exercise of some mysterious arts of suasion upon the representatives of the landlord, who, in utter disregard of their duty to their tenant, allowed him to enter the latter's offices, for an unjustifiable purpose — the installation of a detectaphone therein — and took no steps to limit his trespass to even that wanton interference with the tenant's rights. Having secured admission to a private office, where he had no business to be, defendant availed himself of the opportunity to roam around and inspect the private papers, letters and telegrams which were left unprotected in the fancied security of the owner's private quarters. Having found some of the documents which apparently might interest his employers, he cynically proceeded to select those that suited his purpose and, having read them himself, dictated their contents to his stenographer Lynch, the process taking two or three hours, and Lynch then took his notes, transcribed them, turned the copies over to defendant and the latter delivered them to Mr. Egan, who was in the office of J. P. Morgan & Co. In this expedition defendant was accompanied by his son, whose connection with the matter appears to have been limited to unlocking a door, and by Bartlett Smith, a detectaphone installer, who testifies that defendant " opened the flat topped desk " in the office of Seymour & Seymour, took some papers out and started to dictate them to Lynch, after which Smith went home. Lynch was not called as a witness. The course of

action followed by defendant was absolutely defiant of the rights of all those with whose affairs he was meddling and seems to have been prompted by a belief that the importance of his employers would shield him from any disastrous consequences. It is fair to say that those employers do not appear to have had any knowledge of how far he proposed to go, though it was their representative who arranged to get him access to the offices in question, and they accepted the results of his operations without asking any questions as to how they were obtained. I cannot believe that it was ever the legislative intent to permit such acts as those of the defendant herein to escape punishment, because the papers he thus obtained were not made generally public by being spread broadcast in a newspaper or pamphlet. The evil which was sought to be prevented by the successive provisions of the statute was the violation of the right of privacy of one's private papers and letters. That power was never given to the King of England, to any of his officers, to the United States or any power, State, or any official of either or even to officers of the peace. Yet it was exercised in the case at bar by a private individual without color of official position but engaged solely on a private venture, and here that right was clearly violated by defendant when he made known the contents of the papers in question, first by dictation of their contents to Lynch and then by delivery of copies thereof to Egan. Thereafter the latter showed the copies to Prindle. Meantime Lynch had his stenographic notes of all the letters and papers. How many copies were made does not appear, but enough is shown, I think, to demonstrate that the statute was violated, and the papers in question were "published," using that word in its sense of making known what before was private. (United States v. Williams, 3 Fed. Rep. 484, 486.) Having in mind the purpose of the statute, I see no reason why a stricter construction should be given to the word "publish" as used therein than applies in the case of libel, where commu-

nication of the defamatory words to some person or persons other than the person defamed is sufficient to constitute publication. (Odgers Lib. & Sland. [5th Ed.], chap. vi, p. 157; 18 Halsbury's Laws of England, ¶ 1221; People v. Bihler, 154 App. Div. 618; affd., 210 N. Y. 592.)

I believe the judgment of conviction should be affirmed.

Judgment reversed and defendant discharged.   Order to be settled on notice.