No. 40.—David Giles, plaintiff in error, *vs.* The State of
Georgia, defendant.

[1.] In an indictment for a libel, placed in a situation where it might have
been seen and read, *Held*, that it is unnecessary either to aver or prove that
it was seen or read.

[2.] If a libel import defamation on its face, of a particular person, it is un-
necessary to insert inuendoes in the indictment.

[3.] It is libelous to charge a person with being a drunkard, a cuckold and a
tory.

[4.] A person who appears to have written a libel, which is afterwards pub-
lished, will be considered as the maker of it, unless he show another to be
the author, or prove the act to be innocent in itself.

[5.] If a libel appears under a man's hand-writing, and no other author is
known, it turns the proof upon him; and if he cannot produce the composer,
he is presumed by law to be the man.

[6.] On the trial of criminal cases, moral, and not mathematical or metaphys-
ical certainty, is all that the law requires, or that is attainable. The doubts
of a Jury, to justify an acquittal, should be reasonable, and not a mere vague
conjecture or possibility of the innocence of the accused.

[7.] Direct and irrefragable evidence cannot and need not be always pro-
duced in criminal cases; all that is necessary is, that the Jury, whether the
proof be positive or presumptive, be satisfied of the defendant's guilt.

[8.] A verdict will not be set aside and a new trial granted, where the case
has been fairly submitted on its merits, and no rule of law violated nor man-
ifest injustice done, although there may appear to have been a *preponderance*
of evidence against the verdict, especially if the Judge who tried the case is
satisfied with the finding.

[9.] A new trial will not be granted on the ground of newly discovered evi-
dence, unless it be competent and material to the issue, and would probably
produce a different result if offered, especially where it is merely *cumulative,*
and in corroboration of testimony presented on the former trial.

[10.] Where a party comes to the knowledge of newly discovered evidence,
through the information of others, the affidavit of the informant should be
produced.

Indictment for a libel, Houston Superior Court, October Term,
1848. Tried before Judge Floyd.

David Giles was put on his trial at the October Term of Hous-
ton Superior Court, upon an indictment for a libel:

"For that the said David Giles, on the 6th day of July, 1847,
in said County, did maliciously and falsely utter and publish, that

Giles *vs.* The State of Georgia.

is to say, did then and there write and fasten upon the side of a tree, in a public place, where it could be there read, the following malicious defamation in writing, of and concerning one William Thompson and others, that is to say—

## " NOTICE.

" I am told that William Thompson, (meaning the said William Thompson,) is very smart, both him and A. M. Thomps (meaning A. M. Thompson,) they can make laws and make pople abid by them—like they did when they did—when they find Jessee Hunter for not working the road—M. M. Thompson, (meaning the son of the said William Thompson,) is ther Devil. He is all sap—for dill Sap yos (meaning used) to make old bill drunk and go to bed to old bill's (meaning the said William Thompson's) wife about the right time to git him—and too devils mixt together make one fool devil—too tories mixt together make one fool tory—old Sap was a tory so sed & old Thompson was hung up to the house by a bridle ranes for robing in of houses in the nose."

And the jurors aforesaid, upon their oaths aforesaid, do say that the aforesaid malicious defamation, so then and there uttered and published, then and there tended to blacken the reputation of the said William Thompson, who was then and there living, and thereby then and there tended to expose the said William Thompson to public hatred, contempt and ridicule. The aforesaid written malicious defamation being then and there utterly untrue and false—contrary to the laws of said State—the good order, peace and dignity thereof."

John Sanders testified that he had frequently seen the defendant write ; that he was Bailiff in his district some four or five years, while the defendant acted as Justice of the Peace, and that he believed the libel to be in his hand-writing. Anthony Thompson sworn, said that he was acquainted with the hand-writing of the defendant, from having seen him write often. He had acted with him as associate Justice of the Peace, and he believed the libel to be in his hand-writing. He and William Thompson were Commissioners of the roads two or three years ago, and fined Jesse Hunter for not working on the road. He has a son named Americus Maxwell Thompson ; a man by the name of Dill Sap lived in the near neighborhood of William Thompson many years ago, in Burke County. Joseph Davis stated on oath, that he found the libelous paper on the ground, in or near the side of the

Giles *vs.* The State of Georgia.

road; there was turpentine on it, and a blaze on a pine tree just by; he read it and carried it to Thompson.

James Youman, Stephen Ham and ―――― Smith, testified, each on the part of the accused, that they had seen the defendant write *several times,* and from the knowledge thus acquired, they did not believe the libelous publication to be in his hand-writing.

The defendant was found guilty; whereupon, a motion was made in arrest of judgment—

1. Because there is no sufficient charge of publication in said indictment, it not being alleged that it was seen or read by any one.

2. There is no inducement or other averment setting forth the facts necessary to explain the meaning of the supposed libel.

3. The libel is only alleged to have been published of and concerning William Thompson, (the words " and others" not being sufficient to designate any one else,) and it is not libelous as it respects him, without averment and proof of extrinsic facts connecting him with the libel and explaining its meaning, which averments are not contained in the indictment.

4. It is not libelous to charge a man with drunkenness, and there is no averment that " old Bill" meant William Thompson.

5. The inuendo after " M. M. Thompson" and " old Bill's wife," meaning the son and wife of said William Thompson, are insufficient, there being no averment that he had a son or wife, or that the libel was of and concerning the wife or son.

6. The offence is not set forth with sufficient certainty and precision.

7. The indictment does not set forth any offence, indictable and punishable under the Penal Code of the State.

Which motion was overruled by the Court, and defendant excepted.

Counsel for defendant then moved the Court for a new trial.

1. Because the Court erred in admitting the testimony of A. M. Thompson, in relation to the facts of himself and William Thompson having been Commissioners of roads, and had as such fined Jesse Hunter for not working on the road, there being no averment of these facts in the indictment; and parol evidence was inadmissible, there being higher evidence, which was not shown to have been lost or destroyed.

2. The Court erred in admitting proof that William Thomp-

son had a son by the name of Americus Maxwell Thompson, there being no averment of that fact, or that the libel was of and concerning him.

3. The Court erred in admitting testimony to prove that William Thompson had a wife; that a man by the name of Dill Sap once lived in the same neighborhood with the said William Thompson; that William Thompson was sometimes called " old Bill," there being no averment in the indictment to support the proof.

4. Because the Court erred in charging the Jury, that if they believed that the libel was in the hand-writing of the defendant, was afterwards found by the side of a public road and read, the presumption was, that it was published by him or by his authority; that if it was not so published, it was incumbent on the defendant to prove how it came out of his possession.

5. The Court erred in charging the Jury, that though the defendant was entitled to the benefit of any doubts they might have of his guilt, they must be reasonable doubts—not " a may be so" or " a might be so"—such charge being calculated to prejudice the Jury against the testimony of defendant.

6. Because the Jury found contrary to the evidence—the evidence on the part of the State to prove that defendant wrote the libel being overbalanced by the evidence introduced by defendant.

7. For newly discovered evidence.

The 7th ground was supported by the affidavit of Giles, that he had been informed since the trial, by James Youman, that Quepha Youman, now of Sumter County, would swear "that she was living in Houston, in the same neighborhood with prosecutor and defendant, at the time said alleged libel was found; that soon after, she was at the house of prosecutor, who showed her said paper; that about this time she received a scurrilous writing herself, from another individual than deponent, and from the great similarity in the hand-writing, and the abusiveness of the two papers, and the fact that the writer was at variance with the prosecutor, she would swear that the alleged libel was not written by Giles.

The Court overruled the motion and the defendant excepted.

JOHN M. GILES, for plaintiff in error.

Motion in arrest of judgment.

There is no sufficient charge of publication in the indictment. *Starkie on Slander*, 263. *Watts & Fraser et al.* 7 *A. & E.* 223. 34 *E. C. L. R.* 83. 3 *Ib.* 116, *note. Cooke on Def.* 135, (43 *Law Lib.*) 2 *Greenlf. Ev.* §414. *Clutterbuck vs. Chaffers*, 1 *Stark. R.* 471. 2 *E. C. L. R. Lyle vs. Clason*, 1 *Caine's R.* 581. *Fonville vs. McNease, Dudley's (S. C.) R.* 303. *Cooke on Def.* 14. 2 *Greenlf. Ev.* §414.

No latitude of intendment can include more than is alleged in the indictment. *Per Nisbet, J.* in *Locke vs. The State*, 3 *Kelly*, 540. *Per Warner, J.* in *McLane vs. The State*, 4 *Ga. R.* 341.

There is no inducement or other averment, setting forth the facts necessary to explain the meaning of the supposed libel. *Rex vs. Horne, Cowp. R.* 683. 3 *Chit. Cr. L.* 873. *Stark. Cr. P.* 144. *Archbold's Cr. P.* 525.

The charge of drunkenness is made against "old Bill"—it is not averred that old Bill meant William Thompson, nor is it alleged that he was ever known or designated by that name. *Miller vs. Maxwell*, 16 *Wend.* 14, 15, 16. *Tyler vs. Tillotmon*, 2 *Hill's N. Y. R.* 508.

The inuendo after M. M. Thompson, "meaning the son of the said William Thompson," is insufficient and improper, because the indictment does not allege the libel to be of and concerning a son of William Thompson; nor does the inuendo state what son was meant. The inuendo that old Bill's wife meant William Thompson's wife, is also insufficient and improper, as it is not alleged that the libel was of and concerning his wife, and the inuendo does not set forth her name. 1 *Saund. R.* 242, *n.* 3. *Rex vs. Horne, Cowp.* 683. *Taylor vs. The State*, 4 *Ga. R.* 20. 3 *Chit. Cr. L.* 875.

In support of the motion for a new trial, Mr. Giles cited—*Prince's Dig.* 740. 1 *Greenlf. Ev.* §44. *Best on Presumptions*, 44, *note.* 37 *Lit. L. Lib. Charge of Littledale, J.* to the Jury, *in Regina vs. Lovett*, 9 *C. & P.* 462. 38 *E. C. L. R.* 183. 4 *Sup. Ct. R.* 22. 1 *Kelly. Best on Presumptions*, §215. *Ib.* §170, *p.* 233.

SAMUEL HALL, for defendant in error.

1. The publication is sufficiently alleged and proven. *Starkie on Slander. Comyn's Dig. Libel. B.* 1. 1 *Russell on Crimes*, 235, *et seq.*

Giles *vs.* The State of Georgia.

2. The averment that the libelous matter was of and concerning William Thompson " and others," taken in connection with the matter set out in the indictment, is sufficiently certain under the Statute of Georgia. *Prince*, 643, 644, 658, 659. It must be alleged that the libel was written of and concerning some person. 1 *Russell*, 233, 234. An attempt to excite ridicule, hatred or contempt, against a man's family, is a libel upon him. *The King vs. Bedingfield et al.* 2 *Burr.* 981. 1 *Russell*, 211.

3. The three first grounds taken on the motion for a new trial, cannot be sustained, because it does not appear from the bill of exceptions, that the admission of the testimony was objected to by the plaintiff in error.

4. The Court committed no error in charging the Jury that if they believed the libel was in the hand-writing of the defendant, and was afterwards found by the side of a public road and read, it was incumbent upon the defendant to show how it got out of his possession. The fact of his writing it being proven, the publication is presumed to be by him or his authority. 1 *Russell*, 234, 235.

5. The charge upon the question of doubt, was correct. The doubt must be reasonable to authorize the Jury to acquit. 1 *Starkie on Ev.* 514.

6. The motion for a new trial, upon the ground of newly discovered testimony, was properly overruled, for the reasons that the testimony, if present, was inadmissible.

G. R. HUNTER, in conclusion, for plaintiff in error, cited—

*Price R. p.* 10. 1 *Chit. Cr. L. pp.* 171, '2, 226, 30, 281, 660, 662. 2 *Kelly R.* 16. 4 *Georgia R.* 360. 4 *Ib.* 20, 22. 6 *Pickering R.* 114. 4 *Wendell R.* 579. *Dudley R. Irwin vs. Moul. P. Digest, title Libel.*

*By the Court.*—LUMPKIN, J. delivering the opinion.

[1.] Did the indictment contain a sufficient averment of the *publication* of the libel? It charges that David Giles, the defendant, on the 6th day of July, 1847, did maliciously and falsely "utter and publish, that is to say, did then and there write, and fasten upon the side of a tree in a public place, where it could

Giles *vs*. The State of Georgia.

be there read, the following malicious defamation, in writing, of and concerning one William Thompson (*the prosecutor*,) and others," &c.   It is objected, that it should have been alleged that the libel *was read*.   Was this necessary?   If so, then the fact that it *was read* should have been proven also.   We are of opinion that neither was requisite to constitute the offence.

Actual communication of the contents of a libel, as by singing or reading, is *one mode* of publication; but it is neither the only nor the usual mode.   The common method is by the posting up of the paper, written or printed, or its delivery, and no question is ever asked as to whether it was read or not.  We say of an author that he has *published* a book, when he has given its contents to the world; and we speak of the *publication* of a will, without meaning to denote that the contents of the instrument have been actually communicated.   So it is with a libel.  Publication, says *Best, J.* in *The King vs. Sir Francis Burdett*, is nothing more than doing the last act for the accomplishment of the mischief intended by it.   The moment a man delivers a libel from his hands, his control over it is gone; he has shot his arrow and it does not depend upon him whether it hits the mark or not.   There is an end of the *locus penitentiæ—his offence is complete*—all that depends upon him is consummated; and from that moment, upon every principle of common sense, he is liable to be called upon to answer for his act.

So then, the mere delivering over, or parting with the libel, is a publication.   There need be no averment or proof of the actual communication of the contents of the paper.   Lord *Coke* says, a libel may be *published, traditione*, by delivery, (5 *Reports*, 126, *a;*) and this definition is adopted by Chief Baron *Comyns*, in his *Digest, title, Publication, b.* 1.   If a letter containing a libel is sent sealed to another, or to the party himself against whom it is made, or is addressed through the post office, it is a sufficient publication.   1 *Saund. Rep.* 132, *notes*.

If these propositions be tenable, and I doubt not they are law, then the case before us is free from doubt.   I would only add, upon this branch of the case, that Chief Justice *DeGrey*, in delivering the opinion of the Court in *Baldwin vs. Elphinston*, (2 *Wm. Black. Rep.* 1037,) says, there are in *Rastall's Entr. tit. Action sur le Case*, 13 *a*, two instances of constructive publications,

Giles *vs.* The State of Georgia.

by delivering letters to A and B, *and by fixing them on the door of St. Paul's Church.*

[2.] Many minute and ingenious exceptions are taken to the indictment, for want of proper inuendos to give certainty to the libel. To all of which our answer generally is, that the office of the inuendo is to point out and refer to matter already expressed; to explain the meaning of the publication, when it is obscure, and to designate the persons alleged to have been libelled, when they are alluded to in covert and ambiguous terms. But where the paper itself points out, with sufficient clearness, the persons of or concerning whom it is written, and likewise the purpose for which it was written, the office of the inuendo is superseded—no explanation is necessary. And such is the character of this publication. It is its own interpreter.

[3.] It is argued that it is not libelous to charge a person with being a drunkard. At Common Law any publication is a libel, the tendency of which is to degrade and injure another person, or to bring him into contempt, hatred or ridicule; or which accuses him of a crime punishable by law, or of an act odious and disgraceful in society; and by the Penal Code of this State, a libel is defined to be a malicious defamation, expressed either by printing or writing, or signs, pictures, and the like, tending to blacken the memory of one who is dead, or the honesty, virtue, integrity or reputation of one who is alive, and thereby expose him or her to public hatred, contempt or ridicule.

I ask, is not this publication well calculated to produce these results? I never yet saw the man who liked to be called or considered a sot or drunkard. Noah, the first drunken man, became thereby an object of *ridicule* to his own son. It was the third part of the then male world that manifested this mockery for this habit, and the other two-thirds did but conceal it. True, Ham, as a son, could not justify his unfilial conduct, and he and his descendants, to the present generation, have been deservedly punished for this contempt of his father. This historical fact serves, nevertheless, to illustrate the effect of this habit. But this paper did not stop with imputing excessive debauchery to old man Thompson; it alleges farther, that he was decoyed into his cups for the purpose of being made a cuckold! If this charge would not expose him to universal scorn and contempt, I know not what would, not only with the admirers of Byron—and their name is

legion—and such as would rather be the hero of Don Juan, than the author of the English Bards and Scotch Reviewers, but likewise with the most elevated and worthy of mankind. But the enormity of this libel stops not here. As if to involve its victim in the lowest depths of infamy and disgrace, he is accused, not only of being a tory in the war of the Revolution, but with having been punished in the most ignominious manner for the robberies which he then committed. When the name of Washington shall grow old and cold to the ear of the patriot; when it shall be synonymous with that of Arnold; when "the poles of the earth shall be swung round ninety degrees, to a coincidence with the equator," then, and not before, will it cease to be a libel to call a man a plundering tory of the Revolution!

[4.] The Court charged the Jury, that if they believed the libel was in the handwriting of the defendant—was afterwards found by the side of a public road, *and read*—the presumption was, that it was published by him, or by his authority; that if it was not so published, it was incumbent on the defendant to show how it came out of his possession; and to these instructions the defendant, by his counsel, excepted. Suffice it to say, that the presiding Judge has employed, in this portion of his charge, the very language almost of the books.

[5.] A person who appears once to have written a libel, which is afterwards published, will be considered as the maker of it, unless he rebut the presumption of law, by proving another to be the author, or show the act to be innocent in itself. 4 *Bac. Abr. Libel, b.* 1, *p.* 457. *Lamb's Case,* 9 *Coke,* 59. For if a libel appears under a man's handwriting, and no other author is known, he is taken in the manner, and it turns the proof upon him; and if he cannot produce the composer, it is hard to find that he is not the very man. *Per Holt, C. J. in Rex vs. Beare,* 1 *Ld. Raym.* 417.

[6.] The defendant complains of the charge as to the degree of conviction which should rest on their minds, before they found the prisoner guilty. The Court stated, that while it was true that the defendant was entitled to the benefit of any doubts they might entertain of his guilt, they must be reasonable doubts, not " a may be so," or " a might be so."

I would remark, that the terms in which this doctrine is stated in *Macnally's Evidence,* is well calculated to mislead Juries.

Giles *vs.* The State of Georgia.

They are there enjoined not to give their verdict against a prisoner, without plain, direct and manifest proof of his guilt; which implies, says Sir *Edward Coke*, that where there is *doubt*, the consequence should be acquittal of the party on trial. They are furthermore reminded, that their duty calls on them, before they pronounce a verdict of condemnation, to ask themselves whether they are satisfied, beyond the probability of doubt, that the prisoner is guilty of the charge alleged against him in the indictment. And *Chamberlain, J. B. R.* in his charge to the Jury on the trial of *Finny*, is there reported to have said that, "if there be a doubt, I take it to be a clear maxim, founded in humanity as well as law, that you must acquit the prisoner." *Ridgeway's Rep.* 147.

Now it is conceded, that in all criminal cases whatsoever, it is essential to a verdict of condemnation, that the guilt of the accused should be fully proved; and that neither a mere preponderance of evidence, nor any weight of preponderant evidence, in the language of *Mr. Starkie*, is sufficient for the purpose, unless it generate full belief of the fact, to the exclusion of all reasonable doubt. Still, absolute, mathematical or metaphysical certainty is not essential; and besides, in judicial investigations, it is wholly unattainable. Moral certainty is all that can be required. The proof should be such as to control and decide the conduct of men in the highest and most important affairs of life, and not a mere vague conjecture, a fancy, a trivial supposition, a bare possibility of innocence. To acquit upon *such doubts*, is a virtual violation of the Juror's oath, and an offence of great magnitude against the interest of society, directly tending to the disregard of the obligation of a judicial oath, the hindrance and disparagement of justice, and the encouragement of malefactors. 1 *Starkie*, 514. We consider this to be the fair import of the language used by the Court.

I would add, that great Judges have held, that there is no difference between the rules of evidence in this particular in civil and criminal cases; that if the rules of evidence prescribe the best course to get at truth, they must be, and are, the same in all cases, and in all civilized countries; and *Lord Mansfield*, in the Douglas case, gives the reason for this: "As it seldom happens that absolute certainty can be attained in human affairs, therefore reason and public utility require that Judges, and all mankind, in

forming their opinions of the truth of facts, should be regulated by the superior number of probabilities on one side and on the other."

[7.] While I am not prepared to subscribe to the principle here suggested, still I have deemed it my duty to intimate that it may be going quite too far to say, that even in criminal cases, the guilt of the accused must *always* be established by demonstrative and *irrefragable* evidence. It is enough that the evidence, whatever be its character, whether positive or presumptive, direct or circumstantial, satisfies the understanding and conscience of the Jury.

[8.] A new trial was moved for upon the grounds already considered, and for the farther reasons, that the verdict was contrary to evidence, and on account of newly discovered testimony; and the refusal of the Court to grant this application is excepted to as error.

1. This Court is frequently called on to review the question as to how far it will interfere to set aside a verdict and grant a new trial, where there has been a conflict of testimony, and the case has been fully submitted on its merits; and we have again and again ruled, as we now do, that the verdict of a Jury will not be set aside as against evidence, where there has been evidence on both sides, and no rule of law violated, nor manifest injustice done, although there may appear to have been a *preponderance* of evidence against the verdict; especially where, as in this case, the Judge who tries the cause expresses himself satisfied with the finding. Courts should rarely take it upon themselves to decide on the effect of evidence. Were they so to act, they might, with great justice, be charged with usurping the privileges of the Jury, and making a criminal trial not what it is by our law, a trial by Jury, but a trial by the Court.

[9.] 2. The other ground insisted upon for a new trial is, newly discovered evidence. Giles, the defendant, swears, that since the trial, he has been informed by James Youmans, that he was told, a short time previously, by Quepha Youmans, that she was at the house of the prosecutor when the libel was shown to her by him; that about that period she received a scurrilous paper from an individual living in the neighborhood, (not deponent,) and that from the great similarity in the style of the handwriting, and the abusiveness of the language of the two papers, and from

the fact that the author was at variance with the prosecutor, she would testify that the libel was not written by Giles.

[10.] One capital defect in this showing is, that the defendant swears that a third person informed him that he was told, &c. Why did he not produce the affidavit of James Youmans, his informant? Upon such a statement as this, no man ever would be hung, or imprisoned, or otherwise punished. Who could not get a friend to inform him (not under oath) what another would prove? The prisoner need not *procure* such a communication to be made—it would be voluntarily tendered.

But, aside from this, the newly discovered evidence is merely *cumulative*, or in corroboration of testimony to a point presented at the former trial, to wit: the handwriting of the defendant. Nor would it, if offered, likely produce a different result, consisting as it does, mainly in a comparison of handwriting, and, therefore, of doubtful competency.

On all the points made in the bill of exceptions, the judgment of the Court below is affirmed.