## 5919. LAYTON *v.* THE STATE.

1. There was evidence which authorized the charge of the court on the law of voluntary manslaughter.
2. Where the jury in a criminal case are fully and correctly instructed by the court on the law as to the defendant's statement to the court and jury, and as to their duty to acquit him unless satisfied of his guilt beyond a reasonable doubt, the omission to charge specifically that such a doubt may grow out of the defendant's statement is not error.
3. The evidence authorized the verdict.

DECIDED NOVEMBER 17, 1914.

Indictment for murder—conviction of manslaughter; from Clay superior court—Judge Worrill. July 13, 1914.

*Ben. M. Turnipseed, King & Arnold,* for plaintiff in error.

*B. T. Castellow, solicitor-general, R. R. Arnold,* contra.

WADE, J. The only eye-witness to the tragedy (Dr. Calhoun) testified that in Clay county, in September, 1913, in the afternoon, he saw the defendant, John Layton, walking with Bill Denard down the streets of Fort Gaines, in the direction of Simpson's stable, and saw them both enter the front door of the stable-office from the street, Layton entering first and Denard following; that the witness followed them, as he wanted to see them in reference to a medical bill that Denard owed him, but for which Layton was responsible, and desired to have an understanding with the two men about this account; that Layton had paid a part of the account, and he wanted to see them together about the payment of the balance due; that when he entered the stable-office Denard was standing with his arm on a counter or desk about four and a half feet high and two and a half feet wide, and the defendant was standing at the corner of the desk with his arm also on the desk; that the witness entered and stepped up at the right side of Denard and put his own arm on the desk; that when he went in the office Layton and Denard were in conversation about something, the witness did not understand what, and the witness remarked that he did not want to interrupt, but would like to have an understanding about the business matter between himself and them; that Denard inquired of him whom he held responsible for the account, and he replied that this was what he then wanted to find out—that Layton was responsible for the account, as Denard had moved away from Fort Gaines; that Denard thereupon said that he had had a settlement with Layton, and said to Layton, "I thought you settled the ac-

count of Dr. Calhoun;" that the witness then said he had been told by Layton that Denard had gone away and was getting a good salary and would settle the balance of the account, and added that he wanted to see both Layton and Denard together and have an understanding about it; that Layton then said to Denard, "You are getting a good salary; you told me you were getting about $50 per month," and Denard said, "That is none of your God-damn business;" whereupon Layton stepped behind the counter, "moved his foot around the corner, remaining in the same position, with his arm on the counter," and, as he stepped around behind the counter, Denard presented a pistol towards Layton's face, over the desk. As to what then occurred the witness testified: "I reached up and caught him by the arm and remarked, 'You can't do that;' and I placed my hand across his chest and pulled him kinder behind me. . . Bill Denard was over the desk this way (indicating), and had the pistol presented like that, and I caught him . . and pulled him back behind me, pushing his hand that way, going in the direction of the door to the entrance of the office, pushing him back, and John Layton had . . dropped down behind the counter; and he came up from behind the counter with his pistol in his hand. . . He presented the pistol over the counter. He had the pistol in both hands. He (Layton) had his left hand in his right hand, or his right hand in his left hand, and was pointing his pistol over this counter, and I was pushing Bill Denard back, as I have shown you, and I asked John Layton not to shoot. I said to him, 'Don't shoot, don't shoot,' and the pistol fired. John Layton's pistol fired. At the time John Layton fired his pistol, Bill Denard was kinder behind me, a little bit crouched. I was making an effort to push him out of the door. At the time John Layton fired I had hold of his hand in which he had his pistol, and was shoving his hand down this way that he had the pistol in." The witness further testified that at the time of the shooting Denard was not resisting him, and made no effort to raise his pistol or to take his hand away from the witness, that it was not idfficult to keep Denard behind him, as Denard was making no resistance to the effort to keep him behind; that the bullet passed close to the witness when Denard was behind him, somewhat towards his side; that the bullet entered Denard's neck and mortally wounded him, and he died on Monday night following the shooting, which took

27

place on Saturday afternoon; that only one shot was fired, and Denard fell immediately when Layton shot, without any movement at all, falling on his face and knees; that the witness could not say how long Layton held his pistol in a shooting position before firing at Denard, but before the shot was fired the witness said to Layton, "Don't do that, don't shoot;" and repeated it four or five times before he fired; that the witness had his hand over the thumb and wrist of the hand in which Denard held his pistol, and Denard had his pistol in his hand at the time Layton shot, and never released the pistol until he was shot, and he then dropped it; that at the time of the shooting the witness had Denard's hand which held the pistol, pressed down to a level with the belt of the witness, but the witness was unable to say in what direction the barrel of Denard's pistol was pointing just at the time the shot was fired from Layton's pistol, because the witness was then looking at Layton. There was evidence as to the immediate cause of Denard's death, and evidence showing that when Layton shot, the deceased was crouched down partially behind Calhoun,—that the bullet entered above his collar, and not below; and a witness testified that immediately after the shooting he saw the defendant in the office at the livery-stable, standing behind a counter or desk, and inquired why the defendant had shot the deceased; and the defendant replied, "He came in here and cursed me, and I slapped him, and he presented his pistol at me, and I happened to shoot him first." In his statement at the trial the defendant said that he shot in self-defense, acting under the fears of a reasonable man that the deceased was about to take his life; that the deceased had pointed a pistol in his face, and when Dr. Calhoun pushed the deceased back, he shot, as the deceased still had his pistol pointing at him, and it looked to him as if the deceased was still trying to shoot him.

The first three grounds of the amendment to the motion for a new trial assign error because the court charged the jury on the law touching voluntary manslaughter. It is insisted that the evidence did not warrant such a charge, as there was no evidence of passion, or of a mutual intent to fight, or of a previous quarrel. While the question is a close one, it appears to us, after a careful study of all the circumstances shown by the record, that there was evidence from which the jury had the right to infer that there was a sudden quarrel, a mutual intent to fight, and certainly enough

to authorize the jury to conclude that the killing was done by the defendant in a sudden heat of passion, excited by the profane words and threatening manner of the deceased, and by his act of foolish bravado in presenting his pistol in the face of the defendant before the fatal shot was fired, and that it was not done in self-defense, since the testimony for the State showed that at the time the fatal shot was fired the deceased was being pressed back towards the door of the office by the witness, who stood between him and the accused, and that he was making no resistance and no effort to raise the pistol in the direction of the defendant, and there was no apparent urgent necessity for the killing in order to save the defendant's life, and that the witness, who held the pistol of the deceased pressed down away from the defendant, and who was meeting with no resistance in his efforts to push the deceased backwards through the door, told the defendant repeatedly, "Don't shoot, don't shoot." Everything indicates that the killing was done in a sudden, overwhelming, and blinding heat of passion, which made the slayer oblivious to the surrounding circumstances and regardless of whether danger actually threatened him at the moment when he fired the fatal shot. We think there was enough in the circumstances, especially when taken in connection with the assertion which a witness for the State testified the defendant made immediately after the killing, and which the defendant did not even deny in his statement to the jury, to authorize the charge as to the law of manslaughter.

It is plain that the court did not err, as alleged in the fourth ground of the amendment to the motion for a new trial, in defining to the jury the word "doubt," as follows: "The doubt of the law does not mean a fanciful or captious doubt, it does not mean a vague suspicion or bare possibility that the defendant may be innocent; it does not mean a doubt arbitrarily created in the mind of the jury for the purpose of finding an excuse to acquit, but it means a doubt which has a reasonable foundation upon which to rest; it means the doubt of a fair-minded, reasonable man and juror, who is honestly and earnestly in search after the truth, and which doubt grows out of the evidence, the want of evidence, or proven circumstances in the case." It is insisted that this charge was error because it was an argument deprecating the reasonable doubt of the

law, and too strongly took issue against the weight and validity of such a doubt, and that it excluded the statement of the defendant from the consideration of the jury, in passing upon what constitutes such a doubt, since his statement was nowhere mentioned in defining a reasonable doubt, or as a basis therefor. It appears that in immediate connection with this part of the charge the court fully instructed the jury as to his right to make a statement, and as to the weight which the jury might give to the statement, and that they might believe it in preference to the sworn testimony in the case, and instructed them elsewhere in the charge that the defendant entered upon his trial with a presumption of innocence in his favor, which remained with him until overcome by proof, and that before a legal conviction could be had, the jury must be satisfied of his guilt beyond all reasonable doubt. It has been repeatedly held by the Supreme Court and by this court, that where such instructions are given, the omission to charge that a reasonable doubt may grow out of the statement of the accused is not error. See *Early* v. *State,* 14 *Ga. App.* 467 (81 S. E. 385), and cases cited; *Everett* v. *State,* 15 *Ga. App.* 390 (83 S. E. 428); *Cartledge* v. *State,* 15 *Ga. App.* 396 (83 S. E. 430).

The definition of the word "doubt," given in the foregoing extract from the charge of the court is practically the identical definition given by the trial judge in the case of *Everett* v. *State,* supra, and approved by this court; and in fact somewhat similar definitions have been given by trial judges from time immemorial in this State. See *Giles* v. *State,* 6 *Ga.* 276-285; *Peterson* v. *State,* 47 *Ga.* 524 (5); *Heard* v. *State,* 70 *Ga.* 597 (2a); *Darby* v. *State,* 79 *Ga.* 63 (3 S. E. 663); *Vann* v. *State,* 83 *Ga.* 44-52 (9 S. E. 945). While it is true that it is very seldom that an amplified definition of the term "reasonable doubt" elucidates the meaning of these simple words (*Middleton* v. *State,* 7 *Ga. App.* 1 (66 S. E. 22)), and it is better not to define words so easily understood, it is nevertheless not error for the judge to explain what a reasonable doubt is, where the explanation is correctly given and where no possible harm is thereby done to the accused. A general charge that the jury must be convinced of the guilt of the accused "beyond a reasonable doubt" would be sufficient (*Norman* v. *State,* 10 *Ga. App.* 802,

74 S. E. 428), but amplification which could not mislead the jury or confuse their minds as to the plain meaning of these words is not reversible error.

The evidence as a whole sufficiently supports the verdict, and there is no merit in the general grounds of the motion for a new trial.       *Judgment affirmed. Broyles, J., not presiding.*