### 20793. HORTON *v.* GEORGIAN COMPANY.

DECIDED MARCH 31, 1931.

*Anderson, Rountree, Crenshaw & Hansell, Branch & Howard, Jerome Jones Jr.,* for plaintiff.

*Randolph & Woodruff,* for defendant.

LUKE, J. In an action for libel O. E. Horton exhibits with his petition copies of a series of articles published by The Georgian Company in a newspaper of general circulation, and alleges that the first of said published articles "was intended to and did convey by its direct charges and by insinuation the idea that petitioner and his brother had been involved in a plot and conspiracy to bring about the death of the said Mrs. Tucker by murdering her by the use of poison, and that petitioner and his brother were actuated by the motive, among other things, of getting possession of her estate, . . and the said article was capable of being misunderstood by the public, and was so understood." The petitioner further alleges, that, "in aggravation of the wrong it did to petitioner in publishing the article hereinbefore referred to and set out, petitioner shows that the defendant repeatedly in subsequent

publications of its newspaper in effect reiterated said charges and insinuations against petitioner." Referring to another part of the first of the published articles, which states in effect that in two suits brought against the petitioner and his brother they were charged with a misuse of funds, the petition alleges that "all allegations contained in said suits with reference to any misuse of funds, and the prayer therefor for the removal of petitioner and his brother as trustees of said fund, were wholly immaterial and not germane to the purpose of the action, and the publication thereof, though a part of pleadings in a suit pending in the courts, if otherwise privileged, were, notwithstanding, libelous and actionable." Other allegations of the petition are not deemed essential to the disposition of the questions of law raised by defendant's general demurrer contending that the published articles are not libelous and are incapable of the construction placed upon them by petitioner, and that said publications are privileged, as being fair and honest reports of the proceedings of a judicial body.

The published article, with its headlines, exhibited with the petition and disclosing a sensational allusion to a supposed "poison murder plot looming as a possibility," among other statements contains the following language: "As an outgrowth of the strange order for the disinterment of the woman's body, two prominent Atlanta attorneys have been named in a Fulton county superior court suit charging they misused funds left by Mrs. Tucker 'for education of poor girls.'" Said article also contains this language: "The Horton brothers were named as administrators of Mrs. Tucker's will, and in a suit filed in Fulton superior court on October 23d the Murrell law firm charged them with misuse of funds left in their care by Mrs. Tucker;" and this: "In the suit brought by the Murrell firm they charge the Hortons have misused the dead woman's money by loaning it instead of giving it for the purpose of educating the girls." The above-quoted portions of the publication contain substantially all the alleged libelous and defamatory matter of which the petitioner complains. Other portions appear to be mere variations or repetitions of the same language, or in no way to concern the petitioner. Therefore, they are not restated here.

The first question to be decided is whether or not, under the rules of law applicable to this case, these statements are actionable,

assuming them to have been falsely and maliciously made as alleged in the petition. In answering this question the court is bound to consider the publications as a whole, not in detached or separate paragraphs or sentences, and thus determine whether or not the language is susceptible of only one meaning and interpretation, or, on the contrary, whether the language complained of is so ambiguous as to be susceptible of more than one construction, the one harmless and the other injurious, so that a jury, rather than the court, by taking into consideration all the surrounding facts and circumstances, may be called upon to decide the issue raised. In the determination of this question the well-settled rules of construction require that the words employed shall be given a natural and obvious meaning, in the sense in which the average reader would understand them. In these respects there seems to be no difference of opinion as to the appropriate rules of law, as laid down in the textbooks and in the decisions of our courts.

We now advert to the alleged libelous matter as set out in the petition and its exhibits with a view to an opinion upon the primary question involved, which is: Are, or are not, these publications unequivocally libelous? The petitioner is first alluded to as "one of two prominent Atlanta attorneys [who] have been named in a Fulton county superior court charging they misused funds." If this statement had ended there, without any subsequent explanation or qualification, our inquiry must of necessity have proceeded to another aspect of the question; but in the same article it appears that "in a suit filed in that court, the Murrell law firm charged them [the Horton brothers] with misuse of funds left in their care by Mrs. Tucker;" and, further on, that "in the suit brought by the Murrell firm they charge the Hortons have misused the dead woman's money by loaning it instead of giving it for the purpose of educating the girls." Reduced, then, to a simple form of expression, the statement charged that the petitioner (and his brother) misused certain trust funds by lending them instead of giving them away. Is this charge libelous? No crime is charged; no corrupt purpose is imputed; and no moral turpitude is implied. The qualifying statement, in our opinion, removes the sting of the principal charge, and renders the statement, when read in its entirety, wholly innocuous in the contemplation of the law.

In another portion of the publication, after the introductory

reference to "a poison murder plot," occurs this statement: "Two prominent attorneys indirectly involved in the case are O. E. and M. C. Horton of the law firm of Horton Brothers." However, immediately following the foregoing language the following headline appears in large letters: "WERE ADMINISTRATORS;" and immediately following this headline is this statement: "The Horton Brothers were named as administrators of Mrs. Tucker's will. It is therefore clear that the relationship of the attorneys named to the case referred to was that of an administrator. The petitioner interprets these statements as conveying by direct charge and by insinuation the idea that the petitioner and his brother had been involved in a plot and conspiracy to bring about Mrs. Tucker's death by murdering her by the use of poison. But, in the view of this court, the language used involves no such implications; certainly not without an unwarranted exercise of the imagination.

Upon like considerations, and for like reasons, the other grounds of complaint as set out in the petition are regarded as untenable. For instance, the statements referring to the former partner of the firm of Horton Brothers and his alleged connection with the administration of Mrs. Tucker's estate are not understood as in any way reflecting discredit upon the honesty and integrity of the petitioner. It is distasteful, of course, to any sensitive nature to see his name heralded in a sensational newspaper item suggesting a probable poison murder plot and a charge of larceny; but so long as the petitioner's name is referred to only in those relations to the subject-matter that reflect no discredit upon him, he has no cause of action cognizable by the law. Therefore the trial judge did not err in sustaining the demurrer and dismissing the action.

*Judgment affirmed. Bloodworth, J., concurs. Stephens, J., dissents.*

STEPHENS, J., dissenting. As I construe the petition and the law applicable thereto, I can not concur with my colleagues in the conclusion that the petition does not allege a cause of action for libel. The petition alleges that the defendant, in a series of newspaper publications published in the defendant's newspaper known as the Atlanta Georgian, falsely and maliciously charged, directly as well as by innuendo, the plaintiff and his brother, a firm of Atlanta attorneys, with bringing about the death of Mrs. Tucker, by the administration of poison, for the purpose of obtaining pos-

session of her estate. In addition to the quotations from the petition contained in the majority opinion of this court, the following excerpts, taken from the publications relied upon as libelous, and attached as exhibits to the plaintiff's petition, should be considered in passing upon the sufficiency of the plaintiff's petition. While they are not all full copies of the defendant's publications, they nevertheless fairly illustrate the tenor of these publications, and their libelous character is in no way lessened by anything contained in the publications as a whole. In a publication of October 30, 1929, appears the following: "Expect Poison Murder Plot Baring Here. Exhuming of Woman's Body May Reveal 13-year-old Slaying. Revelation of a poison murder plot, through which two women met their death thirteen years ago, loomed as a possibility to-day with the exhumation in Anderson, S. C., yesterday of the body of Mrs. Clemmie Garrison Tucker, former wealthy Atlantan. As an outgrowth of the strange order for the disinterment of the woman's body, two prominent Atlanta attorneys have been named in a Fulton county superior court suit charging they misused funds left by Mrs. Tucker 'for the education of poor girls,' The Georgian learned exclusively to-day. According to Sam Murrell, member of the Atlanta law firm of Murrell, Murrell & Murrell, who secured the court order for Mrs. Tucker's disinterment and having her vital organs analyzed for traces of poison by the South Carolina state chemist, Mrs. Tucker died here under mysterious circumstances which were not probed at the time of her death. Mrs. Tucker, who left an estate, with no direct heirs, said to be valued at $300,000, died suddenly within three days after an unnamed woman spent the night in the house on South Pryor Street in which she lived alone. Violently Ill. She became violently ill the following day and died in a local sanitarium where it was said her death certificate has become lost. No investigation was made then. Less than two months later, according to Mr. Murrell, the woman who spent the night at Mrs. Tucker's home died suddenly also, under like circumstances. Recently, Mr. Murrell said, he came into definite information that Mrs. Tucker died as a result of poison. Two prominent Atlantans indirectly involved in the case are O. E. and M. C. Horton, of the law firm of Horton Brothers, with offices in the Atlanta Savings Bank Building. Were Administrators. The Horton brothers were named

as administrators of Mrs. Tucker's will, and in a suit filed in Fulton county superior court on October 23, the Murrell law firm charged them with misuse of funds left in their care by Mrs. Tucker. The section of the very short will which names the two Hortons follows, dated October 1, 1915: 'I give, devise and bequeath to O. E. and M. C. Horton, in trust, all of my estate that I have at the time of my death after payment of my funeral ·expenses, to be invested in safe securities and the income therefrom to be used for the purpose of educating poor, worthy girls of good family and legitimate. This fund to be used as the Frances Clementine Tucker fund.' Charge Misuse. In the suit brought by the Murrell firm they charge the Hortons have misused the dead woman's money by loaning it instead of giving it for the purpose of educating the girls. They cite two alleged instances of such charges in the petition accompanying suit." In another publication of the same date appears the following: "Mrs. Tucker's body was disinterred on an order secured by an Atlanta attorney, in Anderson, to examine her vital organs for traces of poison. Dead 13 Years. The wealthy former Atlanta woman died here thirteen years ago and her body was removed to Anderson, her former home, for burial. She left an estate valued at more than $200,000, and circumstances surrounding her death, at the time, were not considered suspicious. Recently, however, the attorney for the woman's estate, came into information which showed his former client died under mysterious circumstances. Operating with greatest secrecy, he obtained a South Carolina court order to exhume the woman's body for a laboratory test of her vital organs, of which The Georgian learned exclusively yesterday. Her body was disinterred late yesterday and the vital organs were sent to the chemical department of Clemson College, Clemson, S. C., for analysis. Accusation Withheld. The Atlanta attorney said to-day he is not prepared to name any suspects or institute criminal procedure until the analysis has been completed. He indicated his information had to do with the disposition of the woman's estate, but would point no finger in definite accusation. Mrs. Tucker died here thirteen years ago after a short and sudden illness which was never clearly defined. Following funeral services here, her body was removed to Anderson for burial, and only the cursory examination of a body, necessary before issuance of a death certificate, was made, the local at-

torney said." In still another publication of the same date appears the following: "Trace Plot In Woman's Death. Suits Filed in Atlanta; Probe is pushed. Exhuming of Body May Reveal Slaying Thirteen Years Ago. Revelation of a poison murder plot, through which two women met their death thirteen years ago, loomed as a possibility to-day with the exhumation in Anderson, S. C., yesterday of the body of Mrs. Clemmie Garrison Tucker, former wealthy Atlantan. As an outgrowth of the strange order for the disinterment of the woman's body, two prominent Atlanta attorneys have been named in a Fulton county superior court suit charging they misused funds left by Mrs. Tucker 'for the education of poor girls.' The Georgian learned exclusively to-day. . . Mrs. Tucker, who left an estate, with no direct heirs, said to be valued at $300,000, died suddenly within three days after an unnamed woman spent the night in the house on South Pryor Street in which she lived alone. Violently Ill. She became violently ill the following day and died in a local sanitarium where it was said her death certificate has become lost. No investigation was made then. Less than two months later, according to Mr. Murrell, the woman who spent the night at Mrs. Tucker's home died suddenly also, under like circumstances. Recently, Mr. Murrell said, he came into definite information that Mrs. Tucker died as a result of poison. Two prominent Atlantans indirectly involved in the case are O. E. and M. C. Horton, of the law firm of Horton Brothers, with offices in the Atlanta Savings Bank Building. Were Administrators. The Horton brothers were named as administrators of Mrs. Tucker's will, and in a suit filed in Fulton county superior court on October 23, the Murrell law firm charged them with misuse of funds left in their care by Mrs. Tucker. . . In the suit brought by the Murrell firm they charge the Hortons have misused the dead woman's money by loaning it instead of giving it for the purpose of educating the girls. They cite two alleged instances of such charges in the petition accompanying the suit. Both the Hortons emphatically denied misuse of the fund and said they were allowed, under the clause of the will quoted, to loan the money if they saw fit. They did not know the dead woman, they said, except in their capacity as attorney, having handled her financial affairs before her death. As executors of her estate, they said, they closed out her accounts and

saw she was buried in Silver Brook Cemetery, Anderson, South Carolina. Body Disinterred. Mrs. Tucker's body was disinterred yesterday by Sheriff W. A. Camp, Coroner J. M. Clark, and Marshall B. Smith, sexton of the cemetery, all officials of Anderson County. Her vital organs were sent to Dr. O. S. Johnson, state chemist, at Clemson College, Clemson, S. C. If Mrs. Tucker is found to have died as a result of poison, it will mean the exhumation by Fulton county authorities of the body of the woman who spent the night with her on the night she became ill and who died shortly afterward, Mr. Murrell said. Fulton county officials have been aiding him in the case so far, he said, and are aware he has information concerning Mrs. Tucker's death." In a publication of October 31, 1929, appears the following: "Atlanta Attorneys Handling Estate Say There is no Basis for Murrell Suit. With her vital organs now under analysis by the State chemist of South Carolina, sensational developments are expected Thursday in the suspected poison murder plot which Tuesday caused the disinterment in Anderson (S. C.) of the body of Mrs. Clementine Garrison Tucker, former wealthy Atlantan. The result is to be made public before nightfall. Mrs. Tucker died in her home on South Pryor Street here thirteen years ago under what were called mysterious circumstances. No investigation was made at the time of her death. Another Disinterment. If her vital organs are found to contain poison it will mean that the body of another woman, who died shortly after Mrs. Tucker and under similar conditions, will have to be disinterred in a local cemetery, Fulton county officials said. Sam E. Murrell, attorney, who instituted the exhumation action, and who filed suit against two Atlanta attorneys charging they misused funds left by Mrs. Tucker, said he would have an announcement to make Thursday regarding the manner in which suspicion was aroused that Mrs. Tucker was poisoned. Dr. Yankey's Statement. Declaring that he distinctly recalled attending Mrs. Tucker just before her death in 1917, Dr. Yankey said there was nothing mysterious about the case. He said that the death certificate, giving pneumonia as the cause of death, was on file at the state health office. O. E. and M. C. Horton, Atlanta attorneys named in the Tucker will as the administrators of her estate, said to be valued at approximately $300,000, are defendants in a suit filed by Murrell charging they misused funds provided for

educating poor worthy girls of good family. Both of the Hortons Wednesday denied the charge, declaring there is no basis for the suit. Replying to the charge that they loaned out the funds instead of investing them, they said they were allowed under the terms of the will to loan them as they saw fit. . . The suit was filed by Murrell in the name of his wife, Mrs. Sam E. Murrell, and her sister, Miss Susie J. Hailey, according to Horton, who contend that they signed notes for loans while minors. He said this fact does not excuse repayment, as there is a Georgia, as well as a South Carolina law, which provides that minors may sign notes for school purposes." In another publication of the same date appears the following: "Sam Murrell made this statement to the Georgian: 'I haven't accused anyone yet,' Mr. Murrell said: 'The probe was instituted to settle rumors which have surrounded Mrs. Tucker's death since she died thirteen years ago. Naturally, if traces of poison are found, criminal action will follow immediately.' Mr. Murrell, representing lineal descendants of Mrs. Tucker, who was said to have left an estate of $300,000 for the education of poor, worthy girls, secured the writ for the disinterment of the body of Mrs. Tucker at Anderson, S. C., where it has rested in a mausoleum since the woman died. The attorney, who has also entered suit against O. E. and M. C. Horton, of the law firm of Horton Brothers, administrators of Mrs. Tucker's estate, charging misuse of the monies, declared the will of the Atlanta matron has not been contested by the lineal heirs." In a publication of November 1, 1929, appears the following: "Part In Tucker Estate Told by E. C. Peek. Eugene C. Peek, Atlanta attorney in Fulton Tower awaiting trial on charge of larceny, said Friday he had aided in administering the estate of Mrs. Clementine Garrison Tucker, former wealthy Atlantan, whose body has been disinterred at Anderson, S. C., for examination for possible traces of poison. Peek formerly was connected with the law firm of Horton Brothers, administrators of the Tucker estate. That firm has been named in a suit by the writ under which Mrs. Tucker's body was dug from its grave. The suit charges misuse of funds of the estate. Peek said he had examined titles to lands taken as security for loans from the estate and that he also had received and distributed money of the estate under direction of the Horton Brothers."

The alleged libelous publications by the defendant specifically

charge that "Mr. Murrell said, he came into definite information that Mrs. Tucker died as a result of poison. Two prominent Atlantans indirectly involved in the case are O. E. and M. C. Horton, of the law firm of Horton Brothers with offices in the Atlanta Savings Bank Building. The Horton Brothers were named as administrators of Mrs. Tucker's will, and in a suit filed in the Fulton county superior court on October 23, the Murrell law firm charged them with misuse of funds left in their care by Mrs. Tucker." While this language does not prima facie charge the plaintiff and his brother with bringing about the death of Mrs. Tucker, it is susceptible to this construction, and might have been so understood by persons to whom it was communicated. The statement that Mrs. Tucker died from poison, and the statement immediately following, that O. E. and M. C. Horton were indirectly involved "in the case," and the statement, immediately following this, that the Horton Brothers were administrators of Mrs. Tucker, and that a suit had been filed against them charging them with the misuse of funds belonging to the estate, constitute language calculated to convey to the person to whom it is communicated the idea that the Hortons had a motive in making away with Mrs. Tucker, viz., that of obtaining possession or control of her estate, and that the "case" which the Hortons were involved in was not a law case, but was the "case" of the poisoning of Mrs. Tucker. These publications stated also that "the Atlanta attorney [i. e., Murrell, the attorney mentioned in the publications as the one who filed the petition to have Mrs. Tucker's body exhumed] said to-day [with reference to Mrs. Tucker's death under "mysterious circumstances"] he is not prepared to name any suspects or institute criminal procedure until the analysis has been completed. He indicated his information had to do with the disposition of the woman's estate, but would point no finger in definite accusation." The publication that this attorney's "information had to do with the disposition" of Mrs. Tucker's estate is certainly calculated to implant in the mind of the person to whom this statement is communicated the idea that the poisoning of Mrs. Tucker was brought about by someone who would benefit by a disposition of her estate, and, as the Horton Brothers were prominently mentioned in the publications as being beneficiaries, to the extent of trustees of the funds of the estate, which they had misused, that the death of Mrs.

Tucker was brought about by the Horton Brothers. It is also specifically stated in the publications that the "firm of Horton Brothers, administrators of the Tucker estate," "has been named in a suit by the writ under which Mrs. Tucker's body was dug from its grave. The suit charges misuse of funds of the estate." The statement that the firm of Horton Brothers was named "in a suit by the writ under which Mrs. Tucker's body was dug from its grave," when it had already been stated in the publications that the petition to have Mrs. Tucker's body exhumed was for the purpose of ascertaining whether she had died from poisoning, is calculated, when taken in connection with the whole tenor of the publication, to implant in the mind of a person to whom this language is communicated the idea that the Horton Brothers had some connection with the death of Mrs. Tucker. Especially is this true when the publication, in the same connection, says the suit charges misuse of the funds of the estate, which necessarily means misuse of the funds of the estate by the Hortons, as elsewhere charged in the publications. It is also specifically stated in the publications that "as an outgrowth of the strange order for the disinterment of the woman's body, two prominent Atlanta attorneys [meaning O. E. and M. C. Horton] have been named in a Fulton county superior court suit charging they misused funds left by Mrs. Tucker for the education of poor girls." The statement that "as an outgrowth of the strange order for the disinterment" of Mrs. Tucker's body "two prominent Atlanta attorneys," necessarily meaning the Hortons, "have been named in Fulton county superior court in a suit charging a misuse of the funds" of Mrs. Tucker's estate, is calculated to cause a person reading this charge to infer that it charges that the Hortons were in some way connected with the death of Mrs. Tucker. From the allegations of the plaintiff's petition, it appears that when the body of Mrs. Tucker was exhumed in South Carolina, under order of court, no traces of poison were found, and that the charge that Mrs. Tucker came to her death from poison was untrue.

While the language of these alleged libelous publications does not expressly and prima facie charge the Hortons with causing the death of Mrs. Tucker, it is such that it might be reasonably construed as making such a charge. Where the language is reasonably susceptible of the construction that it makes a libelous charge, it be-

comes libelous when it conveys that charge and is so understood by the person to whom the writing is communicated. Such language is libelous by innuendo. In the decision in *Holmes* v. *Clisby*, 118 *Ga.* 820 (45 S. E. 684), it is stated that "whenever a publication is susceptible of two constructions, one of which would make it libelous and the other not, it is for the jury to say whether the words are in fact libelous. . . The plaintiff can not by innuendo draw from a writing a conclusion not justified by the language used; but it is competent for the plaintiff to explain in this way an ambiguous publication, to point out the intention of the author, and to show wherein the effect of the language was to injure his reputation. . . And the rule is that a publication must be construed in the light of all the attending circumstances, the cause and occasion of the publication, and all other extraneous matters which will tend to explain the allusion or point out the person in question. . . Words harmless in themselves may become libelous when the circumstances under which they are published are such as to convey a covert meaning to the reader reflecting injuriously upon the reputation of the person to whom they refer." In the decision in *Park* v. *Piedmont & Arlington Life Ins. Co.,* 51 *Ga.* 510, it is stated that "If the plain, unambiguous words contained in the publication do not impute a criminal offense, the meaning thereof can not be enlarged or extended by an innuendo for that purpose; but when the language used is capable of being understood in a double sense, the one criminal and the other innocent, the plaintiff, by making the proper allegations in his declaration, may, by an innuendo, aver the meaning with which he thinks it was published, and the jury may find whether the publication was made with that meaning or not." In *Atlanta News Co.* v. *Medlock,* 123 *Ga.* 714 (51 S. E. 756, 3 L. R. A. (N. S.) 1139), it is stated that "the reading public are not special pleaders, and the impression conveyed to the mind of the average public reader is that which is to be sought for in determining whether a writing is libelous in its nature." In *Williams* v. *Equitable Credit Co.,* 33 *Ga. App.* 441 (126 S. E. 855), it is stated that "Words that do not in themselves unequivocally convey a charge which may become libelous when falsely and maliciously published may nevertheless convey such a charge when the words are capable of being so understood and are so understood by the person to whom they are uttered. Words apparently inno-

cent may convey such a charge when they are considered in connection with the innuendo and the circumstances surrounding their publication." In Washington Post Co. v. Chaloner, 250 U. S. 290 (39 Sup. Ct. 448, 63 L. ed. 987), it is stated that "A publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it. So the whole item, including display lines, should be read and construed together, and its meaning and signification thus determined. When thus read, if its meaning is so unambiguous as to reasonably bear but one interpretation, it is for the judge to say whether that signification is defamatory or not. If, upon the other hand, it is capable of two meanings, one of which would be libelous and actionable and the other not, it is for the jury to say, under all the circumstances surrounding its publication, including extraneous facts admissible in evidence, which of the two meanings would be attributed to it by those to whom it is addressed or by whom it may be read." In Baker v. Warner, 231 U. S. 588 (34 Sup. Ct. 175, 58 L. ed. 384), it was stated by Justice Lamar that "Where words are libelous per se the judge can so instruct the jury, leaving to them only the determination of the amount of damages. Where the words are not libelous per se, and, in the light of the extrinsic facts averred, could not possibly be construed to have a defamatory meaning, the judge can dismiss the declaration on demurrer, or, during the trial, may withdraw the case from the jury. But there is a middle ground where, though the words are not libelous per se, yet, in the light of the extrinsic facts averred, they are susceptible of being construed as having a defamatory meaning. Whether they have such import is a question of fact. In that class of cases the jury must not only determine the existence of the extrinsic circumstances, which it is alleged bring to light the concealed meaning, but they must also determine whether those facts, when coupled with the words, make the publication libelous." In 36 C. J. 1161, it is stated that "Words used in imputing crime should be weighed and considered in the light of the circumstances surrounding the parties at the time, and that effect given to them that they probably produced on the person to whom they were used." Whether language is libelous is a question for a jury. Beasley v. Reid, 68 Ga. 380; Morgan v. Black, 132 Ga. 67 (63 S. E. 821). In Odgers on

Libel and Slander (5th ed.), 116, it is stated that "if the words are incapable of the meaning ascribed to them by the innuendo, and are prima facie not actionable, the judge at the trial will stop the case. If, however, the words are capable of the meaning ascribed to them, however improbable it may appear that such was the meaning conveyed, it must be left to the jury to say whether or no they were in fact so understood"; and in the same work on page 110, "If, however, the judge considers that words are reasonably susceptible of a defamatory meaning as well as an innocent one, it will then be a question for the jury which meaning the words would convey to ordinary Englishmen who heard or read them without any previous knowledge of the circumstances to which they relate." See also Newell on Slander and Libel (4th ed.), 304, 599. .

The controversy over the right of a jury to determine the question of libel or no libel has furnished one of the most spectacular fights in English constitutional history. It culminated in the passage of the Fox libel act in the thirty-second year of the reign of King George III, which was due largely to the efforts of Lord Camden and to the state of the public mind brought about by a denial of this right to juries in the case of the Dean of St. Asaph, on trial for criminal libel, and to Lord Erskine's advocacy of this right as counsel in that case. While the Fox act provided that the jury, in criminal prosecutions for libel, should, subject to instructions by the court, determine the libelous character of the charge, this was generally regarded as but declaratory of the common law. This has always been the law in civil proceedings for libel. See Baylis v. Lawrence, 11 Ad. & El. 920.

In this connection I quote from an able opinion of the late Honorable E. H. Pottle, the learned and distinguished judge of the Northern Circuit, who tried, at nisi prius, the case of Beasley v. Reid, 68 Ga. 380, cited supra. This opinion appears in the record of that case in the archives of the Supreme Court, and was rendered by Judge Pottle March 5, 1881, when overruling a motion for a new trial in that case. His opinion was referred to approvingly by the Supreme Court in affirming that judgment. As a child I remember Judge Pottle well in the days when he presided over the courts of the Northern Circuit. He was my first conception of a judge. I have since come to realize that he was one of the ablest and most distinguished judges that ever graced the Georgia bench.

He was the father of two learned and distinguished Georgia lawyers of a later period, the late lamented Honorable Joseph E. Pottle, who served for a long time as solicitor-general of the Ocmulgee circuit and died while president of the Georgia Bar Association, and of the Honorable J. R. Pottle, now of the Albany bar, who served with great distinction as one of the Judges of the Court of Appeals of this State. Part of this opinion is apropos to the question under discussion, and reads as follows:

"The decisions of the English judges since the 'Fox act' are well known by every lawyer. It is also well known, that the English judges, among whom was Kenyon, refused to give a fair interpretation of that act, and held to the power of the court to define to the jury whether or not the matter of the publication was a libel, leaving the jury alone to decide as to the publication. See Levi v. Milne, 4 Bingham, 195, and other cases. Later the public mind of England turned with great unanimity to the true doctrine as contended for by Lord Erskine in his memorable oration upon this subject. In 1840 this act received a construction in the case of Baylis v. Lawrence, in 11 Adolphus & Ellis [920]. This was a civil case. The presiding judge submitted the case to the jury, without expressing any opinion whatever, whether the publication was, or was not, libelous, or even giving them any instructions as to what constituted a libel. Lord Chief Justice Denman held that the judge was not bound to state his opinion to the jury whether the publication was, or was not, libelous. He said the act of 32 George III was only applicable to criminal cases, but it was a declaratory act, and the importance of declaring the law only existed in cases of criminal libel. The Act, he said, furnished clear evidence that the judge is not in civil cases bound to state his opinions. He also said that he always followed the practice adopted by the judge in this case, of leaving it to the jury to say whether under all the circumstances the publication amounts to a libel. The other judges concurred in this decision.

"In another case, before this, the same decision was made by Lord Chief Justice Abbott in Fairman v. Ives, 5th Barnwell & Alderson, 642. It was left to the jury to say whether the publication was, or was not, libelous. In that case the jury found for the defendant and the verdict was unanimously sustained.

The same principle was decided in Haire *v.* Wilson, 9 B. & C. [643], and in Fisher *v.* Clement, 10 B. & C. [472].

"I cite one more case, and that is the case of Parmiter *v.* Coupland, 6 Meeson & Welsby Exch. Reports, 105. The paper here imputed to the plaintiff partial and corrupt conduct in his office, and ignorance of his duties. The court told the jury what, in point of law, constituted a libel; he left it with them to say whether the publication in question was calculated to be injurious to the character of the plaintiff. Parke, B., said: 'I think there was no misdirection on the part of the learned judge. . . It has been the course for a long time for a judge, in cases of libel, as in other cases of a criminal nature, first to give a legal definition of the offence, and then to leave it to the jury to say whether the facts necessary to constitute that offence are proved to their satisfaction, and that, whether the libel is the subject of a criminal prosecution or civil action.' All of the court concurred. Alderson, B., said, in concurring: 'I think that if he were to take it upon himself to say that it was a libel, he would be wrong in so doing.'" Starkie on Slander, page 359 2d book; 2d Greenleaf Evidence, sec. 411.

"Nor do I conceive that the principles here stated are in hostility to those expressed by our own Supreme Court. There are several cases cited in the brief of the plaintiff's counsel, where the Supreme Court have held, when the case was brought before them, that the words were libelous, such as the case in 6 *Ga.* [*Giles* v. *State, 6 Ga.* 276], to call a man a drunkard, a cuckold, etc., but they do not touch this question. The nearest approach to it is the case of *Pugh* v. *McCarty,* 44 *Ga.* 384. There the court charged the words were libelous if the jury believed that the defendant intended to impute a crime.

"At the common law, and under our statute, to accuse a person of having committed a crime is actionable per se. It is not necessary to charge crime to make a libel. If the printed matter used words which did not impute a crime, it would have been error to charge that they were libelous, and I think that the Supreme Court would have so declared.

"A libel is a false and malicious defamation of another expressed in print, or writing, or pictures, or signs, tending to injure the reputation of an individual, and exposing him to public hatred,

ridicule or contempt. Code. Never could a court say to a jury that the writing in question had all these elements in it. I thought it was right to read to the jury the above definition, and leave it to them to say whether or not it was a libel. Subsequent study has confirmed me in the propriety of that course. Especially was it proper in this case, as the writing was or not libelous, at least in part, as the·innuendoes were proper or improper inferences from the words."

Unless words are clearly and unequivocally not libelous, their alleged libelous character, as we have seen, is a question for the jury. This is the settled law. The petition, in alleging the language of the publications, as quoted, and the language being reasonably susceptible to the construction that the plaintiff was, by implication, charged with bringing about the death of Mrs. Tucker, and that the publications by innuendo make this charge, alleges a libel of the plaintiff. The words of the publications, imputing a crime to the plaintiff, are actionable per se.

In the petition to have the body of Mrs. Tucker exhumed, filed in the court at Anderson, South Carolina, and in the order of the judge of that court upon this petition, copies of which appear attached to the plaintiff's petition, no reference is made to the Hortons. In the Fulton county suit against the Hortons to recover for an alleged mismanagement of funds belonging to Mrs. Tucker's estate, referred to in the publications, there is nothing which charges any connection between the Hortons and the death of Mrs. Tucker. Therefore the publications of the defendant, in so far as they intimate that the Hortons were connected with bringing about the death of Mrs. Tucker, were not fair and honest reports of court proceedings, and therefore were not privileged as such. I am of the opinion that the plaintiff's petition, with the innuendoes alleged, set out a cause of action for libel, and was good as against general demurrer.

No one will go further than I will in defending the liberty of the·press and the freedom of speech. These are sacred rights of our English heritage. But the right of a citizen to the good name and character which he has spent a lifetime in acquiring is no less sacred, and neither the right of free speech nor that of the freedom of the press implies any right, by false and malicious

charges, even by implication, to tear down and destroy the good name and character of another.

I dissent from the judgment of affirmance.